NOTICE

Decision filed 10/23/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220116-U

NO. 5-22-0116

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 20-CF-851 |
| | ) | |
| LONDON J. TAYLOR, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

---

JUSTICE WELCH delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's first degree murder conviction and sentence is affirmed where (1) Illinois's proximate cause theory of felony murder was not unconstitutional as applied to him, (2) the court applied the correct version of the felony murder statute, (3) the jury was properly instructed on accountability and felony murder, (4) the court did not err or abuse its discretion in permitting the lead investigator to remain at the prosecutor's table during the trial, (5) the court did not err or abuse its discretion in permitting the lead detective to testify about his interpretation of Facebook messages between the defendant and his co-offender, and (6) his sentence was not excessive.

¶ 2    At a jury trial, the defendant, London Taylor, was found guilty of first degree felony murder (720 ILCS 5/9-1(a)(3) (West 2020)). The trial court sentenced him to 28 years' imprisonment. On direct appeal, the defendant argues that (1) Illinois's proximate cause theory of felony murder was unconstitutional as applied to him, (2) the amended version of the felony murder statute should

1

apply retroactively, (3) the jury was given improper and confusing accountability instructions for first degree murder, (4) the trial court erred in allowing the investigating detective to remain at the prosecutor's table for the duration of the trial, (5) the court erred in allowing the detective to testify as to his interpretation of certain Facebook messages relating to the incident, and (6) his sentence was excessive.

¶ 3                                    I. BACKGROUND

¶ 4     The defendant's felony murder conviction arose out of the attempted commission or commission of a robbery after the victim, Keith Baker, shot and killed the defendant's co-offender, James Coleman. The defendant was charged under the proximate cause theory of felony murder that was in effect at the time of the shooting (May 2020).

¶ 5     The evidence at the November 2021 jury trial showed the following. In the early morning hours of May 21, 2020, Baker and Coleman were shooting dice for money at Coleman's apartment with approximately three other people. The defendant was not involved in the game; however, he was sitting on the living room couch, which was in view of the kitchen where they were playing. Baker was winning, and at some point, Coleman ran out of money. Coleman told everyone that it was time to leave, but he ultimately agreed to continue the game if everyone gave him $10. He then used that money to continue playing, but eventually also lost that money.

¶ 6     Malik Womack, who was present that night, indicated that he sensed something was wrong; he felt like something was "about to go down" because Coleman kept going into the bedroom. Equarieon Jeter, who was also there, indicated that Coleman had sent him a Facebook message telling him that "we" were planning on robbing Baker.

¶ 7     After Coleman returned from the bedroom for the final time, he approached Baker, pulled a gun on him, and pointed it at Baker's chin. Everyone else, including the defendant, ran out of the

2

apartment. Womack heard one gunshot after he exited the apartment; he had assumed that Coleman shot Baker. Womack did not see the defendant with a firearm and did not see the defendant do anything other than exit the apartment after Coleman pointed the gun at Baker. However, Womack was unable to see the defendant while exiting the apartment because of its layout. Jeter also exited the apartment immediately after Coleman pulled out the gun and heard one gunshot after he was outside. While outside, he saw Baker running out of the building. He noted that the defendant was pretty quiet that night and kept to himself. He did not see the defendant with a firearm and did not see the defendant approach the kitchen table.

¶ 8 Diamond Craig, Coleman's girlfriend, lived with Coleman and her one-year-old daughter. She was at home in the bedroom on the night of the shooting. She fell asleep around 1 a.m. but woke up when she heard her bedroom door being pushed in. Coleman fell into the room, crawled back out, and then ran to the front of the apartment. She then heard a gunshot and the front door slam. She went into the living room and observed Coleman lying on the floor by the couch. He was not moving, but he was still breathing. She called 9-1-1 and then subsequently heard a knock at the front door. The person knocking was the defendant, and she let him back inside. She asked the defendant what had happened, but he could not say anything because he was in shock. She noticed that Coleman had money covered in blood in his hand. She did not see any firearms in the apartment. The defendant never came into the bedroom that night.

¶ 9 Baker testified that he had a 9-millimeter Smith and Wesson handgun in his waistband that night. As he was rolling the dice, Coleman came up next to him, put a gun under his neck, and took the money out of his pocket. Baker thought Coleman was the only one carrying a gun. Baker saw the defendant take a half-step in their direction and "sort of" pull out what Baker believed to

3

be a gun from his waistband. Baker then pushed Coleman toward the defendant, pulled out his gun, and shot twice. He dropped the gun and ran out of the apartment.

¶ 10 Baker acknowledged telling defense counsel that the defendant was standing back, not engaging, and did not touch him during the incident. He acknowledged that he denied telling anyone that the defendant had a firearm that night and saying that he did not have a choice but to testify at the defendant's trial. He had believed that, if the defendant was not charged, then it would "fall back on" him, but he did not know why he believed that. When he turned himself in to the police, he knew there was a warrant for his arrest. He told Detective Sumption that the defendant pulled out a firearm during the incident. After speaking with the prosecutor and the detective, he learned that he could not be charged with first degree murder and could only be charged with perjury if he lied during his testimony.

¶ 11 James Warren, a patrol sergeant for the City of Champaign Police Department, observed two spent shell casings in the apartment, one of which was located on the couch and one in the baseboard heating element in the living room. He also observed two unfired 9-millimeter rounds, one in the living room and one on the kitchen counter. James Hobson, a detective for the police department, testified that officers conducted a thorough search of the apartment, the building, and outside the building but did not recover any firearms. The parties stipulated that a forensic scientist would testify that the recovered bullets were fired from the same firearm and the recovered cartridge casings were fired from the same firearm but that she could not determine whether the casings and bullets were fired from the same firearm without having the gun to compare them to.

¶ 12 Dustin Sumption, also a detective with the police department, testified about Facebook messages between the defendant and Coleman on the night of the shooting. On May 21 at 1:12 a.m., Coleman messaged the defendant, "We 'bout to get Keith [Baker]," to which the defendant

4

responded, "OFN." Sumption, testified that, based on his years of experience as a police officer, "OFN" meant, "On foe and nem." He explained that this had a similar meaning as "hand to the Bible" but was just different street terminology. Coleman then messaged, "Grab joint, how we gone do it, outside or in here?" Sumption explained that "joint" could have several different meanings, and it depended on the context. He believed that "joint" was "gun" in this context. The defendant responded, "I D M." Sumption indicated that this either meant, "It doesn't matter" or "I don't mind."

¶ 13    Coleman then wrote, "We gone get 'em in the hallway," which Sumption believed meant that they would commit the robbery in the hallway. The defendant responded, "Bet," which Sumption indicated was agreement. Coleman then said, "When I snatch bro money, up on Keith [Baker], get close," and the defendant responded, "Ight." Sumption indicated that, based on his experience and the previous testimony, Coleman was telling the defendant to get close and pull his gun on Baker when Coleman took Baker's money, and the defendant indicated his agreement.

¶ 14    Coleman then messaged, "Up on 'em," which Sumption indicated meant to pull the gun on him. The defendant responded, "Boa, no, we gone to get 'em in the hallway. Grab 'em, and I'm gone to up on 'em inna hallway." Sumption testified that "Boa" was a slang term for "boy" and that he believed that the defendant was telling Coleman that he was going to pull a gun on Baker in the hallway. Coleman responded, "Let me see blick, just go in the pockets." Sumption indicated that "blick" was a commonly used slang term for firearm and that he had heard that term multiple times during his work as a police officer. He interpreted the message as Coleman telling the defendant, "no, actually you take his money. You go in the pockets, you take his money." Coleman also messaged, "No E or Malik," which to Sumption meant to leave Jeter and Womack out of it. The defendant responded, "Ight, you've gotta up first," which to Sumption meant that Coleman

needed to brandish the firearm first. Coleman then wrote, "Put it in the bathroom," and the defendant responded, "Ight." In the final message, sent at 1:47 a.m., Coleman wrote, "Grab his pipe first." Sumption indicated that "pipe" was the most common street name for a firearm. The shooting was reported at 2:02 a.m.

¶ 15    During the defendant's police interviews, videos of which were played for the jury, the defendant initially claimed that he was in the bathroom during the shooting; he claimed he did not see anything and only heard the gunshots. However, after learning that Coleman was dead, he named Baker as the shooter and admitted that he was in the front room.

¶ 16    Amanda Wallace, a legal assistant at defense counsel's firm, testified that she was present for the conversations that defense counsel had with Baker. During the conversations, Baker told defense counsel that he had never told anyone that the defendant possessed a firearm that night. He also indicated that he believed the State would do something bad to him if he did not testify against the defendant.

¶ 17    The defendant then testified that he did not have his own vehicle, so he relied on Coleman for transportation. At about 10 p.m. or 11 p.m. on May 20, the defendant sent Coleman a Facebook message asking for a ride, but he never received a response. He eventually met up with Coleman, who was playing dice. During the game, the defendant sat on the couch directly in front of the kitchen table and listened to music on his phone. Everyone was drinking and smoking marijuana. The defendant noted that Coleman was awkward and did not seem like himself that night. Baker was winning most of the money that night, and the other players got angry when Coleman indicated that he wanted to take a cut of the money. Baker had a gun in the waistband of his pants that was visible when he moved a certain way. The defendant did not have a firearm that night, and he did not see Coleman with a gun.

6

¶ 18    The defendant acknowledged receiving the Facebook messages from Coleman but did not agree with Sumption's interpretations of them. The defendant did not know what Coleman was talking about when Coleman messaged, "We 'bout to get Keith." By replying "Ofn," the defendant was saying "oh fuck no" because he did not want to be involved in Coleman's plan. When Coleman messaged, "Grab joint, how we gone do it, outside or in here," Coleman was asking the defendant whether they were going to smoke the "rolled-up blunt" in the hallway or inside the apartment. The defendant then responded that it did not matter. The defendant thought that Coleman's message, "We gone get him in the hallway," meant that they were going to smoke in the hallway. Coleman's message, "When I snatch bro money, up on Keith, get close," meant that Coleman was going to take Baker's money. However, the defendant did not believe that Coleman was serious since there were too many people around, Baker had a gun, and a one-year-old was in the apartment. When the defendant responded, "Ight," he was just trying to appease Coleman because he did not want Coleman to get angry at him.

¶ 19    Coleman then wrote, "Up on 'em," and the defendant thought Coleman was "tripping," and he did not know what Coleman was talking about. The defendant then explained that, when he messaged Coleman, "Boa no we gone get 'em in the hallway" and "Grab 'em, and I'm gone to up on 'em inna hallway," he was trying to trick Coleman into letting everyone get into the hallway so everyone could just leave. He thought that Coleman was trying to involve him in the plan when Coleman messaged him, "Let me see blick. Just go in the pockets," but he did not want to be involved. He noted that Coleman's next message, "No E or Malik," indicated that Coleman was not going to do anything to them. The defendant felt pressured by Coleman, so he responded, "Ight, you've gotta up first." He explained that he was saying anything to appease Coleman at that point. He did not know what Coleman was saying when Coleman messaged him, "Put it in the bathroom,"

7

but he still responded "Ight" to appease Coleman because Coleman was not taking no for an answer. The defendant never put anything in the bathroom. He did not respond when Coleman sent him the final message saying, "Grab his pipe first." At some point after the last Facebook message was sent, the defendant spoke to Coleman and told Coleman that he did not believe that Coleman should rob Baker because it was too risky.

¶ 20    The defendant was looking at his phone when he heard Coleman say, "Keith, you tweaking, calm down." He looked up and saw everyone running toward the door while Coleman and Baker were wrestling and tangled up together. They were heading in his direction, so he got off the couch to get out of the way, and he went to the door. He denied advancing toward them during the altercation. When he opened the door, he heard two gunshots and saw Baker run by him and out of the building.

¶ 21    The defendant briefly left the apartment but went back inside to help Coleman, and he was in the apartment when the officers arrived. He initially told them that he was in the bathroom during the shooting and did not see anything because he did not want to be involved or be a witness. After he learned that Coleman had died, he changed his story because he felt like there was no point in continuing to lie.

¶ 22    The defendant acknowledged that he never actually told Coleman "no" when they were messaging back and forth. He denied knowing what "pipe" meant and did not remember his May 23 Facebook conversation with Lynnette Bonney where he indicated that he needed to find a "pipe ASAP." He also did not remember Bonney's response, "All right, what happened to his gun you had?" or his subsequent response, "They won't tell me." Further, he did not remember telling Bonney, "Day, D U I, say day, D U I, got rid of it." He acknowledged that the Facebook messages were from his account but denied knowing what "pipe" meant in that context and disputed that he

8

was referring to a gun. He admitted that Bonney knew that, at some point, he had someone's gun, and she was asking about it. He also admitted that, when he returned to the apartment after the shooting, he gathered the money in the apartment and gave it to Craig's sister. He acknowledged deleting some of the messages between him and Coleman, but he denied knowing that the messages were hurtful to him at the time. He denied taking a gun from Coleman's apartment that night and disposing of any ammunition.

¶ 23 After deliberations, the jury ultimately found the defendant guilty of first degree felony murder and not guilty of unlawful possession of a weapon by a felon. Thereafter, the trial court sentenced him to 28 years' imprisonment. The defendant appeals.

¶ 24                                    II. ANALYSIS

¶ 25          A. Constitutionality of Proximate Cause Theory of Felony Murder

¶ 26 The defendant first argues that Illinois's proximate cause theory of felony murder was unconstitutional as applied to him. Specifically, he argues that the proximate cause theory violates his right to due process because he did not share a mental state with Baker, the person who actually shot Coleman, as Baker was not a participant in the underlying robbery. Thus, he argues that the proximate cause theory allows for a murder conviction under circumstances where the prosecution cannot show the applicable *mens rea*.

¶ 27 Initially, we note that the defendant did not make these arguments in the trial court. However, where the evidentiary record developed below is sufficient, the constitutionality of a statute may be challenged for the first time on appeal. *People v. Martin*, 2018 IL App (1st) 152249, ¶ 12. Since the record in this case is sufficiently developed, we will address the defendant's constitutional claims that were raised for the first time on appeal.

9

¶ 28    Statutes are presumed to be constitutional, and, if reasonably possible, a court must construe a statute to affirm its constitutionality. *People v. Howard*, 2017 IL 120443, ¶ 24. The party challenging the validity of a statute has the burden to clearly establish that it is unconstitutional. *Id.* Here, the defendant contends that his constitutional challenge is an as-applied challenge. "An as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party." *People v. Thompson*, 2015 IL 118151, ¶ 36. The constitutionality of a statute is a question of law, which is subject to *de novo* review. *People v. Gray*, 2017 IL 120958, ¶ 57. The due process clause will invalidate a state criminal statute if that law offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *People v. Watson*, 2021 IL App (1st) 180034, ¶ 23.

¶ 29    It is well settled that a defendant may be found guilty of felony murder regardless of a lack of intent to commit murder. *People v. Jones*, 376 Ill. App. 3d 372, 387 (2007). "Felony murder derives its mental state from the underlying intended offense." *Id.* The purpose of felony murder is to deter individuals from committing foreseeable felonies by holding them responsible for murder if a death results. *Id.* Felony murder is premised on strict liability. *People v. Causey*, 341 Ill. App. 3d 759, 769 (2003). The State is not required to prove that defendant could foresee the death or intended to commit murder; instead, the State must show that defendant intended to commit the underlying felony. *Id.*

¶ 30    "In considering the applicability of the felony-murder rule where the murder is committed by someone resisting the felony, Illinois follow[ed] the 'proximate cause theory' " prior to the amendment of the statute in July 2021. *People v. Lowery*, 178 Ill. 2d 462, 465 (1997); 720 ILCS 5/9-1(a)(3) (West 2020). The focus under that theory was whether defendant's actions set in

10

motion a chain of events that ultimately caused the decedent's death. *Lowery*, 178 Ill. 2d at 473. Under the proximate cause theory, liability attached for any death proximately resulting from the unlawful activity, notwithstanding the fact that the killing was committed by the one resisting the felony. *Id.* at 465.

¶ 31    The Illinois Supreme Court stated as follows regarding the application of the proximate cause theory:

> "We believe that the analogies between civil and criminal cases in which individuals are injured or killed are so close that the principle of proximate cause applies to both classes of cases. Causal relation is the universal factor common to all legal liability. In the law of torts, the individual who unlawfully sets in motion a chain of events which in the natural order of things results in damages to another is held to be responsible for it.
>      It is equally consistent with reason and sound public policy to hold that when a felon's attempt to commit a forcible felony sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act. Thus, there is no reason why the principle underlying the doctrine of proximate cause should not apply to criminal cases. Moreover, we believe that the intent behind the felony-murder doctrine would be thwarted if we did not hold felons responsible for the foreseeable consequences of their actions." *Id.* at 466-67.

¶ 32    Thus, the reason behind the felony murder statute was to limit the violence accompanying forcible felonies by automatically subjecting individuals to a murder prosecution charge when someone is killed during the commission of a forcible felony. *People v. Belk*, 203 Ill. 2d 187, 192 (2003). In this case, the proximate cause theory served that purpose because the defendant was found to have been a participant in the attempted commission of a forcible felony, Baker's robbery, and Coleman was killed as a result of the violence accompanying that felony. In other words, had the defendant and Coleman not attempted the robbery, Coleman would not have been shot and killed.

¶ 33    Our supreme court specifically concluded that, consistent with the established case law on the proximate cause theory, a defendant may be charged with murder under a felony murder theory

11

when an intended victim of the felony shoots and kills a cofelon of defendant. *People v. Dekens*, 182 Ill. 2d 247, 252 (1998). Thus, we are bound by this decision and will not find that the proximate cause theory violated the defendant's due process rights. Moreover, we note that, although felony murder does not require an intent to kill, it does require a *mens rea*, *i.e.*, the intent to commit the underlying felony.

¶ 34 The defendant next argues that the proximate cause theory constituted an unconstitutional, mandatory presumption of his guilt as long as the State proved the commission or attempted commission of the predicate underlying felony, even in the absence of a mental state to commit murder. "A presumption is a legal device which permits or requires the fact finder to assume the existence of a presumed or ultimate fact, after certain predicate or basic facts have been established." *People v. Watts*, 181 Ill. 2d 133, 141 (1998). There are two categories of presumptions: permissive or mandatory. *Id.* at 142. A mandatory presumption is one where the fact finder cannot reject the proffered presumption, and it may be conclusive or may shift the burden of proof. *Id.* Mandatory presumptions relieve the State of its burden of persuasion by removing the presumed element from the case entirely if the State proves the predicate facts. *Id.* "Once such a presumption is triggered, the defendant is not allowed to attempt to rebut the connection between the proven and presumed facts." *Id.* Mandatory, irrebuttable presumptions have long been held to be unconstitutional. *Id.* at 144.

¶ 35 Here, the jury was instructed as follows regarding felony murder:

"A person commits the offense of first degree murder when he commits the offense of Robbery, and the death of an individual results as a direct and foreseeable consequence of a chain of events set into motion by his commission of the offense of Robbery.
It is immaterial whether the killing is intentional or accidental or committed by a third person trying to prevent the commission of the offense of Robbery."

12

The defendant argues that a reasonable jury would have understood this instruction as mandatory, *i.e.*, once the jury found that the defendant attempted to commit or committed the robbery, it would have no choice but to find him guilty of felony murder. He also argues that he could not rebut that presumption because, even though Baker had acted in self-defense, he could not argue that he was not liable for Baker's justifiable act since the availability of traditional defenses were limited in felony murder cases. Thus, he argues that, because the application of the proximate cause theory creates a mandatory presumption of guilt for felony murder for any death that results from a forcible felony, the State is relieved of its burden of proving beyond a reasonable doubt the *mens rea* for Coleman's death. We disagree with the defendant's arguments.

¶ 36    We again note that the supreme court cases clearly established that the proximate cause theory of felony murder was followed in Illinois at the time that Coleman was killed. Also, we disagree that the State was relieved of its burden of proving every element of the offense of felony murder beyond a reasonable doubt. The State was required to prove that the defendant committed or attempted to commit the underlying forcible felony, the robbery, either by showing that he knowingly took property from Baker or from Baker's presence with the use of force or the threat of imminent use of force or by showing the defendant was legally responsible for Coleman's robbery of Baker under a theory of accountability. See 720 ILCS 5/18-1(a), 5-2(c) (West 2020). The State next had to prove that Coleman's death occurred during the commission or attempted commission of the robbery and that it was a foreseeable consequence of the robbery or attempted robbery. Further, as we noted above, although the State did not have to prove intent to kill for

13

felony murder, it did have to prove a *mens rea*, *i.e.*, that the defendant intended to commit the underlying felony.[1]

¶ 37     The defendant further argues that imposing the same punishment that applies to one who committed intentional or knowing murder, in the absence of a *mens rea*, violates due process and the prohibition on cruel and unusual punishment. In support of his argument, the defendant cites *Enmund v. Florida*, 458 U.S. 782, 800-01 (1982), in which the U.S. Supreme Court held that a defendant's sentence of death violated the eighth amendment as he neither committed the killing nor intended to kill. The Court found that, for the purposes of imposing the death penalty, defendant's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility. *Id.* at 801. Since the record did not warrant a finding that defendant had any intention of participating in or facilitating a murder, the Court concluded that his sentence of death was unconstitutionally excessive. *Id.* at 798, 801. However, we decline to extend the *Enmund* ruling to this case where our supreme court has said that a defendant could be convicted of felony murder under the proximate cause theory even when the person doing the killing was not a participant of the underlying felony, where the death penalty was not imposed, and where the trial court considered the defendant's own criminal culpability when fashioning his 28-year sentence.

¶ 38          B. Application of the Amended First Degree Murder Statute

¶ 39     The defendant contends that the amended first degree murder statute should have applied to abate his prosecution since it amounted to a clarification of the felony murder rule. Specifically,

---

[1]The defendant has not challenged the sufficiency of the evidence relating to the underlying felony in his appellate briefs, so we will not evaluate whether the evidence was sufficient to convict him of felony murder.

14

the defendant contends that the amended statute clarified that the agency theory of felony murder, which limited the scope of liability to participants of the underlying felony, should apply instead of the proximate cause theory. Alternatively, the defendant argues that adherence to the general rule that substantive changes do not apply retroactively would be repugnant in his case since, had Coleman's shooting taken place on July 1, 2021, or later, the defendant could not have been convicted of felony murder.

¶ 40 The first degree murder statute in effect when the shooting occurred stated as follows regarding felony murder:

> "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
> * * *
> (3) he or she is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(3) (West 2020).

However, this statute was subsequently amended to state as follows:

> "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
> * * *
> (3) he or she, acting alone or with one or more participants, commits or attempts to commit a forcible felony other than second degree murder, and in the course of or in furtherance of such crime or flight therefrom, he or she or another participant causes the death of a person." 720 ILCS 5/9-1(a)(3) (West 2022).

¶ 41 A new statute can only be applied retroactively in certain circumstances. See 5 ILCS 70/4 (West 2020). Section 4 of the Statute on Statutes provides as follows:

> "No new law shall be construed to repeal a former law, whether such former law is expressly repealed or not, as to any offense committed against the former law, or as to any act done, any penalty, forfeiture or punishment incurred, or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offense or act so committed or done, or any penalty, forfeiture or punishment so incurred, or any right accrued, or claim arising before the new law takes effect, save only that the proceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceeding. If any penalty, forfeiture or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any

15

judgment pronounced after the new law takes effect. This section shall extend to all repeals, either by express words or by implication, whether the repeal is in the act making any new provision upon the same subject or in any other act." *Id.*

¶ 42 Section 4 is a general savings clause that, in interpreting, our supreme court has held forbids the retroactive application of substantive changes to criminal statutes. *People v. Gancarz*, 228 Ill. 2d 312, 319 (2008); *People v. Glisson*, 202 Ill. 2d 499, 505-07 (2002). Consequently, the retroactive application of amendments or repeals in criminal statutes is permissible only if such changes are procedural in nature. *Glisson*, 202 Ill. 2d at 507. A statutory amendment creates a presumption that it was intended to change existing law, but this presumption is not controlling. *People v. Stewart*, 2022 IL 126116, ¶ 20.

¶ 43 Procedural laws are laws that establish the ways in which rights or duties are judicially enforced, while substantive laws are laws that create and define those rights and duties. *People v. Stefanski*, 2019 IL App (3d) 160140, ¶ 14. "Whether a legislative modification of a statute is held to indicate an intent to change the law as it previously existed or only to clarify the terms of the law depends upon the circumstances involved." *People v. Hare*, 119 Ill. 2d 441, 451 (1988). The following circumstances may indicate a legislative intent to clarify rather than make a substantive change: whether the enacting body declared that it was clarifying a prior enactment, whether a conflict or ambiguity existed prior to the amendment, and whether the amendment is consistent with a reasonable interpretation of the prior enactment and its legislative history. *Stewart*, 2022 IL 126116, ¶ 20. Whether the statutory amendment at issue applies retroactively presents an issue of statutory construction subject to *de novo* review. *People v. Hunter*, 2017 IL 121306, ¶ 15.

¶ 44 In this case, the statutory change to the felony murder rule is not of a procedural nature. This is a substantive change that seemingly limited the scope of liability for felony murder to participants in the underlying felony. In other words, it makes a substantive change from the broad

16

felony murder rule, the proximate cause theory, which allowed for liability when the murder was committed by someone resisting the felony, to the agency theory, which requires the murder be committed by the offenders and co-offenders of the underlying felony.

¶ 45     As support for this conclusion, there is no indication in the legislative history that the legislature intended this change to be a clarification of the felony murder provision of the first degree murder statute. Instead, the legislative history seems to indicate the opposite. During the January 13, 2021, hearing, Representative Slaughter stated as follows regarding the change: "The Bill narrows our broad felony murder rule to bring it in line with the majority of other states." 101st Ill. Gen. Assem., House Proceedings, January 13, 2021, at 6-7 (statements of Representative Slaughter). Moreover, there was no indication that there was a conflict in the courts as to the meaning of the prior version of the felony murder provision and nothing to indicate that the amendment was made to resolve any conflict. We also note that by arguing that, if the shooting had occurred after the change in law, he could no longer be prosecuted for felony murder, the defendant is acknowledging that the amendment narrowed the scope of liability. Accordingly, we conclude that the amendment, which defined conduct that is considered felony murder and narrowed the scope of liability, was a substantive rather than a procedural change.

¶ 46     The defendant also argues, in the alternative, that prosecuting him for felony murder would be repugnant. Section 1 of the Statute on Statutes provides as follows: "In the construction of statutes, this Act shall be observed, unless such construction would be inconsistent with the manifest intent of the General Assembly or repugnant to the context of the statute." 5 ILCS 70/1 (West 2020). However, we conclude that it would not be repugnant to the context of the statute to prosecute the defendant based on the version of the felony murder provision that was in effect at the time the shooting was committed.

17

¶ 47                              C. Jury Instructions

¶ 48    The defendant next contends that the trial court erred in instructing the jury on accountability because it did not apply to his felony murder charge since the theory pursued by the State was that he was liable for Coleman's death based on his participation in the robbery. He argues that he could not have an accountable mental state with Baker, the actual shooter, nor could he be charged with intentional or knowing murder based on accountability. He argues that, consequently, the jury was instructed on two contradictory theories of guilt for murder, accountability and felony murder. In making this argument, the defendant concedes that he has forfeited these claims by failing to object to the jury instructions at the trial level. However, he nevertheless argues that the issue may be considered under the second prong of plain error review. Alternatively, he argues that his trial counsel was ineffective for failing to object to the instructions. In response, the State contends that the defendant was charged with felony murder under a theory of accountability, and the given jury instruction for felony murder based on accountability accurately stated the law.

¶ 49    The plain-error rule is a narrow and limited exception to the general rule of forfeiture. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). Under the plain-error doctrine, a reviewing court will review an unpreserved error when a clear and obvious error occurs and: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against defendant; or (2) the alleged error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process. *People v. Thompson*, 2017 IL App (5th) 120079-B, ¶ 24. The first step is determining whether an error occurred. *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 45.

18

¶ 50    The function of jury instructions is to provide the jury with accurate legal principles to apply to the evidence so it can reach a correct conclusion. *Id.* Whether the jury instructions accurately stated the applicable law is reviewed *de novo. People v. Hartfield*, 2022 IL 126729, ¶ 51. In addressing the adequacy of the instructions, the reviewing court must consider the instructions in their entirety to determine whether they fairly, fully, and comprehensively apprise the jury of the relevant legal principles. *Id.*

¶ 51    Accountability is not a crime in and of itself; it is a mechanism through which a criminal conviction may result. *People v. Pollock*, 202 Ill. 2d 189, 210 (2002). Section 5-2(c) of the Criminal Code of 2012 (720 ILCS 5/5-2(c) (West 2020)) provides that a person may be held accountable for the conduct of another where, "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." A felony murder is a murder that occurs during the commission of a forcible felony. *Id.* § 9-1(a)(3). Accountability for felony murder exists only if defendant may be deemed legally responsible for the felony that accompanies the murder. *People v. Shaw*, 186 Ill. 2d 301, 325 (1998).

¶ 52    In this case, the jury was instructed as follows regarding felony murder and accountability. First, the jury was instructed that:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense."

The jury was also instructed that, "A person commits the offense of first degree murder when he, or one for whose conduct he is legally responsible, kills an individual if, in performing the acts which cause the death, he is attempting to commit the offense of robbery."

19

¶ 53    Then, the jury received this instruction for felony murder, in pertinent parts:

> "To sustain the charge of first degree murder, the State must prove the following propositions:
>
> First Proposition: That the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of James Coleman;and
>
> Second Proposition: That when the defendant, or one for whose conduct he is legally responsible, did so he was attempting to commit the offense of    Robbery."

Lastly, the jury was instructed that:

> "A person commits the offense of first degree murder when he commits the offense of Robbery, and the death of an individual results as a direct and foreseeable consequence of a chain of events set into motion by his commission of the offense of Robbery.
>
> It is immaterial whether the killing is intentional or accidental or committed by a third person trying to prevent the commission of the offense of Robbery."

¶ 54    Reading the instructions in conjunction with each other, the jury was instructed that the State must prove that the defendant, or one for whose conduct he is legally responsible, attempted to commit or committed a robbery and the death of an individual resulted as a direct and foreseeable consequence of the parties committing (or attempting to commit) that robbery. Collectively, these instructions accurately conveyed the relevant law to be applied to the facts of the case, so that the jury could determine whether the defendant was legally responsible for the felony that accompanied the murder. Thus, the trial court's instructions on accountability and felony murder accurately stated the applicable law.

¶ 55    Although the defendant relies on *People v. Dennis*, 181 Ill. 2d 87 (1988), to support his position that accountability did not apply to his felony murder charge, we note that *Dennis* dealt with a specific subset of the felony murder rule, the felony murder escape rule. There, our supreme court concluded that the felony murder escape rule was incompatible with accountability and declined to apply it in that context. *Id.* at 105-06. However, the present case does not involve the felony murder escape rule. Moreover, as noted above, our supreme court has explicitly allowed for convictions of felony murder under a theory of accountability. We also note that the defendant

has not cited to any case law saying that the proximate cause theory of felony murder was legally incompatible with accountability. Thus, we conclude that there was no error here.

¶ 56    Finally, the defendant's claim that trial counsel was ineffective in failing to pursue this issue below also fails. See *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 43 (a defendant who alleges ineffective assistance of counsel must demonstrate that counsel's performance falls below an objective standard of reasonableness, and given that the jury instructions were not erroneous, it was not objectively unreasonable for trial counsel to forego challenging them).

¶ 57                                    D. Detective Sumption

¶ 58                                    1. Witness Exclusion

¶ 59    The defendant argues that the trial court erred in permitting Detective Sumption, who was the lead detective, to remain in the courtroom during the trial. He contends that, by allowing the State's Attorney to designate Detective Sumption as its representative, the court erroneously interpreted Illinois Rule of Evidence 615 (eff. Jan. 1, 2011) to permit the State to have two designated representatives—the State and Detective Sumption. He also contends that the detective's presence was highly prejudicial because it unfairly bolstered his credibility and intimidated reluctant witnesses.

¶ 60    Illinois Rule of Evidence 615 (eff. Jan. 1, 2011) instructs as follows:

> "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by law to be present."

"While some jurisdictions, including the federal courts, consider the exclusion of witnesses to be a matter of right, in Illinois exclusion of witnesses is a matter within the sound judicial discretion of the trial court." *People v. Chatman*, 2022 IL App (4th) 210716, ¶ 67. An abuse of discretion

occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *People v. McDonald*, 2016 IL 118882, ¶ 32. To the extent that the proper interpretation of Rule 615 is at issue, our review is *de novo*. *People v. Campbell*, 224 Ill. 2d 80, 84 (2006).

¶ 61    "It is well settled under Illinois law that a testifying police officer may be present at trial during other witnesses' testimony and sit at the prosecutor's table with counsel." *Chatman*, 2022 IL App (4th) 210716, ¶ 69. Relying on the Advisory Committee Notes to the 1974 Enactment of Federal Rule of Evidence 615 (Dec. 1, 2011), which is analogous to the Illinois rule, the Fourth District in *Chatman* concluded that a lead detective could be designated as the State's representative under Illinois Rule of Evidence 615. *Chatman*, 2022 IL App (4th) 210716, ¶ 70. Specifically, the federal committee note stated as follows:

> "Many district courts permit government counsel to have an investigative agent at counsel table throughout the trial although the agent is or may be a witness. The practice is permitted as an exception to the rule of exclusion and compares with the situation defense counsel finds himself in—he always has the client with him to consult during the trial. The investigative agent's presence may be extremely important to government counsel, especially when the case is complex or involves some specialized subject matter. The agent, too, having lived with the case for a long time, may be able to assist in meeting trial surprises where the best-prepared counsel would otherwise have difficulty. Yet, it would not seem the Government could often meet the burden under rule 615 of showing that the agent's presence is essential. ***
>
> This problem is solved if it is clear that investigative agents are within the group specified under the second exception made in the rule, for 'an officer or employee of a party which is not a natural person designated as its representative by its attorney.' It is our understanding that this was the intention of the House committee. It is certainly this committee's construction of the rule."

Accordingly, like *Chatman*, we find that the trial court may permit Detective Sumption, as the lead detective, to remain in the courtroom during the trial as a designated representative of the State. In other words, he fell within the second exception established in Illinois Rule 615.

¶ 62    Further, we conclude that the defendant has failed to establish that he was prejudiced by the detective's presence in the courtroom. It is not inherently prejudicial for an investigative agent to be seated with the prosecutor during trial. Thus, Detective Sumption's mere presence, without more, is not enough to show that his credibility or the State's case was unfairly bolstered. Also, after reviewing the testimony, we conclude that there is nothing in the record to support the defendant's argument that Detective Sumption's presence in the courtroom during the trial intimidated witnesses.

¶ 63                                        2. Testimony

¶ 64    The defendant argues that the trial court erred in allowing improper opinion testimony from Detective Sumption as his interpretation of the Facebook messages between the defendant and Coleman was not based on the detective's own personal observations or perceptions. The defendant also argues that Detective Sumption's testimony was not admissible because he was not qualified as an expert.

¶ 65    Assuming *arguendo* that Detective Sumption's testimony was improper lay opinion testimony, that error is harmless if the witness was qualified as an expert and would have been accepted as an expert by the trial court if tendered as one. See *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 110. A witness may testify as an expert if his experience and qualifications afford him knowledge that is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion. *People v. Pingelton*, 2022 IL 127680, ¶ 55. This is codified in Illinois Rule of Evidence 702 (eff. Jan. 1, 2011), which provides as follows:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

There is not any explicit requirement as to the level or extent of experience, education, scientific

23

study, or training that is required to qualify a witness to offer expert testimony on a subject. *Pingelton*, 2022 IL 127680, ¶ 56. In determining whether the testimony is proper, the relevant question is whether the witness has knowledge and experience beyond the average citizen that would assist the jury in evaluating the evidence. *Id.*

¶ 66   Here, although Detective Sumption was not tendered as an expert witness, the trial court permitted Detective Sumption to testify as to his interpretation of the messages based on his training and experience as to the common meaning of the words used. Detective Sumption testified that he was a detective for the Champaign Police Department with a focus on violent crime, crimes against people, robberies, death investigations, and fugitive investigations. He was also laterally assigned to the U.S. Marshal's Service as a Special Deputy U.S. Marshal. As a marshal for the Great Lakes Regional Fugitive Task Force, he assisted local law enforcement with executing warrants, investigations, and arrests, all related to violent crimes. He had been in law enforcement since 2007 and had been a detective and marshal for approximately six years. Thus, he was qualified to testify as to the meaning of the street vernacular used in the Facebook messages as he would be familiar with the terms through his training, knowledge, and experience in law enforcement.

¶ 67   Moreover, we note that, during trial, the defendant presented an alternative meaning behind the messages in his own testimony. The jury, thus, had to determine the credibility of each witness, determine what weight to give to the testimony, and determine which interpretation it believed. It is for the trier of fact to resolve conflicts or inconsistencies in the evidence. *People v. Rojas*, 359 Ill. App. 3d 392, 398 (2005). As the reviewing court, we will not substitute our own judgment for

that of the jury on questions involving the weight of the evidence or the credibility of the witnesses.[2] See *id.*

¶ 68                                E. Excessive Sentence

¶ 69    Lastly, the defendant contends that his 28-year sentence was excessive. A trial court has broad discretionary powers in determining a sentence, and its decisions are afforded great deference. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 26. When a defendant challenges a sentence, the standard of review is whether the trial court abused its discretion in imposing the sentence. *Id.* This level of deference is given because a trial court is generally in a better position to determine the appropriate sentence and weigh factors such as defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Id.* When a sentence falls within the statutorily statutory limits, it will not be found to be excessive or an abuse of discretion unless the sentence greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Id.* ¶ 28. An abuse of discretion occurs where the sentencing court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *Id.* ¶ 26.

¶ 70    A proper sentence balances the seriousness of the offense with the objective of restoring a defendant's rehabilitative potential. Ill. Const. 1970, art. I, § 11; *People v. Clemons*, 2012 IL 107821, ¶ 29. The Unified Code of Corrections sets out certain statutory factors in aggravation and mitigation that a trial court must consider when imposing a sentence of imprisonment. 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2020). In fashioning the appropriate sentence, the court must carefully consider all of the factors in aggravation and mitigation, and other factors, such as defendant's age,

_____

[2]In saying this, we note that the defendant has not challenged the sufficiency of the evidence regarding his felony murder conviction in his appellate briefs.

25

demeanor, habits, credibility, criminal history, social environment, and education as well as the nature and circumstances of the crime and of defendant's conduct in the commission of the crime. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). When such factors have been presented for the trial court's consideration, it is presumed, absent some contrary indication, that the factors have been considered. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). A trial court has wide latitude in sentencing a defendant, as long as it neither ignores relevant mitigating factors nor considers improper factors in aggravation. *Id.* at 157.

¶ 71   Here, the defendant was convicted of first degree murder, which had a sentencing range of 20 to 60 years' imprisonment. See 730 ILCS 5/5-4.5-20(a) (West 2020). In sentencing him to 28 years' imprisonment, the sentence was well within the prescribed sentencing range and below the State's recommendation (the State recommended a sentence of 40 years). Before announcing the sentence, the trial court was presented with testimony about a May 2019 incident where the defendant physically assaulted his then-girlfriend; a March 2018 incident where he fled from police, and police recovered a firearm in his flight path; and photographs of him with firearms posted on Facebook. The court also heard testimony about how he voluntarily attended a workforce development program and how he was engaged and always respectful to others in the program and testimony from his mother about how his father was killed while in police custody when he was a child and how he was raised by his grandmother because his mother had substance abuse issues. The court further heard testimony and argument about the defendant's mental health issues, his remorse, his substance abuse issues, his rehabilitative potential, his actual participation in the offense, and the change in the felony murder statute.

¶ 72   In sentencing him to 28 years, the trial court considered, in aggravation, the fact that the defendant had a history of delinquency and criminal conduct, which included "felonies and

physical, harmful offenses," and the need for deterrence. The court noted that the defendant's Facebook posts depicted a glorification of firearms and disrespect for the law. In mitigation, the court acknowledged that the defendant did not contemplate that his conduct would cause physical harm; his conduct was induced or facilitated by someone other than himself in that there was no doubt that Coleman was the primary instigator of the incident that led to his own death; the defendant's prior history with successfully completing probation; his young age and the specific circumstances of young offenders; and his rough start in life.

¶ 73    The trial court carefully considered the evidence before it at sentencing, weighed the factors in aggravation and mitigation, and fashioned an appropriate sentence in line with the seriousness of the offense and the defendant's potential for rehabilitation. We decline to reweigh the evidence and usurp the trial court's discretion to fashion an appropriate sentence. Based on the record before us, we conclude that the defendant's 28-year sentence was not greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. Accordingly, we find that the imposed sentence was not an abuse of discretion. Moreover, the defendant's argument that his trial counsel was ineffective for failing to file a motion to reconsider his sentence must likewise fail. See *People v. Givens*, 237 Ill. 2d 311, 331 (2010) (failure to file a futile motion does not establish ineffective assistance of counsel).

¶ 74                                    III. CONCLUSION

¶ 75    For the foregoing reasons, we affirm the judgment of the circuit court of Champaign County.


¶ 76    Affirmed.