NOTICE
Decision filed 08/18/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230040-U

NO. 5-23-0040

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Coles County. |
| | ) | |
| v. | ) | No. 16-CF-242 |
| | ) | |
| SHAWN D. ADAMSON, | ) | Honorable |
| | ) | Mark E. Bovard, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice McHaney* and Justice Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's first degree murder conviction and sentence where (1) Illinois's proximate cause theory of felony murder was not unconstitutional as applied to him, (2) the trial court applied the correct version of the felony murder statute, (3) defense counsel was not ineffective, (4) the court properly denied his posttrial *Brady* claim, and (5) defendant's sentence does not violate Illinois's proportionate penalties clause as applied to him.

¶ 2    Following a jury trial in the Coles County circuit court, defendant, Shawn D. Adamson, was convicted of two counts of first degree murder (720 ILCS 5/9-1(a)(3) (West 2016)), one count of attempted armed robbery (*id.* §§ 8-4(a), 18-2), one count of conspiracy to commit armed robbery (*id.* §§ 8-2(a), 18-2), and one count of unlawful possession of a weapon by a felon (*id.*

_____

*Justice Welch participated in oral argument. Presiding Justice McHaney was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

1

§ 24-1.1(a)). Defendant appealed, and the Fourth District affirmed defendant's conviction and sentence for unlawful possession of a weapon by a felon but reversed and remanded the cause for a new trial on the remaining counts. *People v. Adamson*, 2020 IL App (4th) 180631-U, ¶ 113.

¶ 3    Following a new trial on remand, defendant was convicted of two counts of first degree murder, one count of attempted armed robbery, and one count of conspiracy to commit armed robbery. The trial court sentenced defendant to 48 years in prison, including 28 years for first degree murder and a 20-year firearm enhancement. Defendant appeals, arguing that (1) Illinois's proximate cause theory of liability is unconstitutional as applied to him, (2) the amended first degree murder statute should have applied to abate his prosecution, (3) he received ineffective assistance of counsel, (4) the State violated its obligation to disclose favorable defense evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and (5) his *de facto* life sentence violates Illinois's proportionate penalties clause. For the following reasons, we affirm.

¶ 4                                I. Background

¶ 5    A full recitation of the facts relating to defendant's first jury trial was set forth in the Fourth District's decision in *Adamson*, 2020 IL App (4th) 180631-U. We recite only those facts necessary to our resolution of the instant appeal, which stems from defendant's second jury trial in September 2021. We recite additional facts in the analysis section as necessary to address defendant's specific arguments on appeal.

¶ 6    Both of defendant's jury trials stemmed from an incident that occurred in Mattoon, Illinois, on or about June 18, 2016. On that date, defendant traveled with Matthew Cook and Kevin Johnson to the apartment of Dion Dixon. James Todd Shafer was at Dixon's apartment with his girlfriend, Ciara Faires. Faires was on the porch area of the apartment when defendant, armed with a gun, arrived with Cook and Johnson. Shortly after defendant arrived, defendant fired a shot and Shafer

2

fired shots from inside the apartment towards the porch area of the apartment, hitting Faires in the chest. Faires later died from her injuries.

¶ 7    The second jury trial involved charges against defendant for first degree murder, attempted robbery, and conspiracy to commit armed robbery. In support of the first degree murder charges, the State alleged that defendant, without lawful justification, while attempting to commit the forcible felonies of armed robbery and mob action, proximately caused the death of Faires. In support of the attempted armed robbery charge, the State alleged that defendant, with the intent to commit the offense of armed robbery, performed a substantial step toward the commission of that offense, where he traveled to Dixon's apartment with Cook and Johnson to take property by force from another person while armed with a firearm. In support of the conspiracy to commit armed robbery charge, the State alleged that defendant, with the intent to commit armed robbery, agreed with Cook and Johnson to the commission of that offense, and performed an act in furtherance of that agreement while armed with a firearm.

¶ 8    Prior to defendant's second jury trial, defendant moved to dismiss the first degree murder charges based on the legislature's July 1, 2021, amendment to Illinois's felony murder statute. Defendant alleged that the felony murder statute was amended from "he or she is attempting or committing a forcible felony other than second degree murder" to "he or she, acting alone or with one or more participants, commits or attempts to commit a forcible felony other than second degree murder, and in the course of or in furtherance of such crime or flight therefrom, he or another participant causes the death of a person." See Pub. Act 101-652 (H.B. 3653) (eff. July 1, 2021). Defendant claimed the amended felony murder statute should operate to abate the State's prosecution of the first degree murder charges against him where Shafer fired the shots that killed Faires and the State did not assert that defendant and Shafer participated together in an underlying

3

felony. The trial court denied defendant's motion, finding that the amendment to the statute was silent on retroactivity and that the law in effect in 2016 applied.

¶ 9 At trial, several individuals, including Shafer, testified regarding a failed robbery that occurred on June 16, 2016. The testimony demonstrated that Shafer needed money to travel to Texas. Shafer and a friend, Brett Magana, went to defendant's house to borrow guns to rob a man named Justin Davis. Shafer and Magana obtained two guns and attempted to commit the robbery but failed. After the failed robbery, Shafer and Magana kept the guns with the intention of committing additional robberies. The State introduced a statement Magana gave to police indicating his belief that the guns belonged to defendant.

¶ 10 The testimony demonstrated that, over the course of the next two days, Shafer and Magana planned additional robberies and avoided defendant and several other individuals who were attempting to retrieve the guns. The State introduced two Facebook messages from defendant to Magana, which were sent the afternoon of June 16, 2016. The first message stated:

"Bro, you must lost your mind or will to live. Give it back or there will be no turning back and that's on everything I love, kid. You got an hour. If you do, I will make sure no one touches you or him or anybody else around you. If not, I wash my hands."

The second message stated:

"Bro, what the fuck, you must lost your mind or will to live. Shaking my mother fucking head. Give it back or there will be no turning back and that's on everything I love, kid. You got an hour. If you do, I will make sure no one touches you, him, or anybody else around you. If not, I wash my hands and that's a promise."

¶ 11 The testimony demonstrated that Magana and Shafer later separated. Magana was subsequently arrested at an abandoned hotel and found in possession of a gun. Defendant, along

4

with Cook and Johnson, continued to look for Shafer. Cook and Johnson located Shafer on the street and confronted him about the stolen guns.

¶ 12 Shafer's mother, Letha Shafer, testified that the evening of June 17, 2016, defendant, Cook, and Johnson came to her home and directed her to tell Shafer that "he had two hours to give the hardware back" but "they did not care about the bullets." Later that evening, Shafer and Faires came to Letha's home. Letha asked Shafer to give her the gun, but he refused. Shafer testified that he went to Dixon's apartment because he had nowhere else to go and needed a place to wait until his bus left for Texas the following morning.

¶ 13 Dixon and his girlfriend, Adrianne Esparza, testified regarding the events that occurred the evening of June 17, 2016. Shafer and Faires arrived at Dixon's apartment unannounced shortly before midnight. Esparza wanted Shafer and Faires to leave. Dixon began arguing with Shafer and Faires. Dixon threw their bags onto the porch of the apartment to get the two to leave. Shafer pushed Faires out onto the porch, locked the door, and continued to argue with Dixon.

¶ 14 Dixon and Shafter both testified that during the argument they heard a knock on the door. They observed people standing on the porch with Faires. Dixon did not vividly recall the events because he was high but he thought he saw a flash of something and panicked. The State impeached Shafer with his prior testimony from his own trial, wherein he testified that he observed a person holding a silver revolver and heard a gunshot. Dixon and Shafer retreated to a back bedroom and Dixon called 9-1-1. Shafer fired two shots from the bedroom.

¶ 15 The State did not introduce any physical evidence establishing that a gunshot was fired outside of the apartment. The State also did not introduce any evidence demonstrating that the individuals attempted to force entry into the apartment.

5

¶ 16    Johnson testified at trial pursuant to a plea agreement with the State. In exchange for his testimony at trial, the State dismissed pending charges against him for possession of methamphetamine and a firearm and allowed him to plead to two additional possession of methamphetamine charges in exchange for probation.

¶ 17    Johnson testified that he was friends with Shafer and defendant in June 2016. On June 17, 2016, Johnson received a Facebook message from defendant that stated something about getting something back before defendant "kills that little backstabbing bitch." While Johnson initially did not know what defendant was referencing when Johnson received the message, Johnson later learned that Shafer stole guns from defendant.

¶ 18    Johnson, Cook, and defendant searched for Shafer the evening of June 17, 2016. Johnson went to Dixon's apartment with defendant and Cook after they learned Shafer was there. They were "[j]ust going to go talk to [Shafer]." Once at Dixon's apartment, the three men observed Faires standing on the back porch area outside the apartment. Faires became scared because she saw defendant with a gun. Defendant "raised the gun" and Faires "got scared and screamed." Johnson clarified that defendant pointed the gun at Faires. Johnson asked defendant to put the gun away and defendant complied. Johnson asked Faires to text Shafer to tell him to come out and talk about giving the guns back. While Johnson talked to Faires, defendant and Cook "[f]lanked the house." Johnson then heard what "sounded like a gunshot or something." When Johnson looked in the direction where he heard the noise, he observed defendant standing near the door of Dixon's apartment "fumbling with his gun" before putting "it away." Johnson speculated that the gun "went off on accident or something because [defendant] looked startled" at that time.

¶ 19    Johnson testified that he directed defendant and Cook to flee before someone called law enforcement. The three men began to run in different directions. Johnson attempted to grab Faires

6

but she did not follow the men. As Johnson was running, he heard one or two gunshots followed by screaming. Johnson, defendant, and Cook all ended up at defendant's mother's house. The three men then proceeded to run to defendant's house. Johnson noted that both defendant and Cook "looked shook up, startled, whatever." The three men then began watching defendant's security camera.

¶ 20 Melanie Houts testified that she was at Johnson's house the evening of June 17, 2016, or early morning of June 18, 2016. Houts admitted that she was battling addiction at that time. She recalled that, among others, Johnson and defendant were at Johnson's house. Houts recalled that defendant had a gun. Defendant "looked nervous, fidgety, whatever." Houts further recalled that she overheard defendant on the phone "talking about burning some clothes."

¶ 21 Lorrenda McWhorter testified regarding her interaction with defendant on June 19, 2016. McWhorter admitted that she had a criminal history, including charges of robbery, domestic battery, and resisting a peace officer. McWhorter also admitted that she was a recovering drug addict. McWhorter denied that she received anything for her testimony. On June 19, 2016, McWhorter asked defendant about the shooting incident and defendant advised McWhorter that "he shot the gun up in the air and Ciara had deserved what had happened to her."

¶ 22 Brienna Laidley, Faires's sister, testified that she was familiar with defendant, Cook, and Johnson from drug use. Laidley was at defendant's house on June 17, 2016. While there, Laidley observed a black handgun and silver revolver. Laidley went to a nearby gas station around midnight on June 18, 2016. When Laidley left the gas station to return to defendant's house 5 or 10 minutes later, she observed defendant and Johnson running down a nearby road towards defendant's house. Laidley observed Johnson and defendant once they arrived back at defendant's

house. Johnson was "really erratic" and defendant was "pouring sweat." Defendant lifted his shirt and exposed a revolver in his waistband.

¶ 23    At the close of the State's evidence, defense counsel moved for a directed verdict. Defense counsel, relying on *People v. Mills*, 252 Ill. App. 3d 792 (1993), noted that "there must likewise be an overt withdraw from the commission of or an intent to commit a forcible felony in order to avoid the consequences of the felony murder doctrine." Regarding the mob action charge, defense counsel asserted that the witness testimony demonstrated that defendant, Cook, and Johnson ran after defendant fired or misfired the gun. Defense counsel asserted that "mob action terminate[d]" at the point when all three men fled the scene. Defense counsel further asserted that the fatal gunshots occurred "after the mob action ha[d] terminated." Defense counsel additionally argued that Johnson had no intention of using force or violence and, thus, Johnson and defendant did not act together with the use of force or violence. Defense counsel maintained that "the disturbing the peace that we're trying to get to, that also didn't exist here, because we have no testimony other than that there was a knock at the door and an attempt to text." Defense counsel went on to state that there was "such a tangential tie between the charge of mob action and the felony murder that that's why I'm asking the Court to examine the chain of causation that existed." Defense counsel then argued as follows:

> "In this case, we have an actual stop in the causation, in the proximate cause in that timeline. The timeline is gun goes off. We have Mr. Shafer running to get his gun, running across a very short apartment—I will give you that—turning around, kneeling by the bed, fires through the door as—as [defendant], Mr. Johnson, and Mr. Cook are running away. That break in causation between that mob action and that the [*sic*] of Ciara Faires is enough for the Court to find that the elements of felony murder have not been met."

8

¶ 24 Defense counsel also indicated that the same arguments supported dismissal of attempted armed robbery. Defense counsel stated that there was a break in causation "because the minute they all run from that scene is the minute any of these crimes stop." The trial court denied the motion. Defense counsel also renewed the motion to dismiss based on the July 1, 2021, amendment to Illinois's felony murder statute. The trial court denied the motion.

¶ 25 The defense presented no evidence. The jury convicted defendant on all counts, including the two counts of first degree felony murder, and found that defendant personally discharged a firearm during the offense.

¶ 26 Defendant filed a posttrial motion alleging, *inter alia*, that the trial court erred by denying his motion to dismiss based on the July 1, 2021, amendment to the felony murder statute. Defendant additionally alleged that he recently learned the State failed to disclose that witness McWhorter sought a deal benefiting her paramour in exchange for her testimony. Defendant claimed that, contrary to McWhorter's testimony that she received no benefit in exchange for her testimony, she sought a bond reduction for her boyfriend in an unrelated pending case. The State filed a response to defendant's motion and denied that McWhorter received, or attempted to receive, a deal from the State. The State attached an affidavit from an assistant state's attorney, who attested that she was unaware McWhorter was a witness in defendant's trial at the time of the preliminary hearing.

¶ 27 Defendant mailed a *pro se* supplement to the posttrial motion. Defendant attached an affidavit from his posttrial attorney, who attested that she had an informal conversation with the State's Attorney who advised that McWhorter sought a deal for her boyfriend in exchange for her testimony in defendant's case but that the State did not agree to a deal. Defendant requested an evidentiary hearing. The trial court denied the request for a hearing and found no *Brady* violation

9

where McWhorter made no agreement with the State and the assistant state's attorney did not know McWhorter was a witness in defendant's case when she agreed to a bond reduction.

¶ 28    The trial court sentenced defendant to 48 years' imprisonment, including 28 years for first degree murder and 20 years for the mandatory firearm enhancement.[1] In doing so, the court noted defendant's extensive criminal history, which included possession of cannabis, driving on a revoked license, unlawful possession of a weapon, and unlawful possession of a controlled substance. The court stated, "And frankly, to put it bluntly, the defendant's criminal history is more thorough than his work history." The court noted that it was "bound to a minimum of 20 years for the Department of Corrections plus the 20-year enhancement for the discharge of a firearm that the jury specifically found."

¶ 29    Defendant filed a motion to reconsider sentence and an amended motion. Defendant argued that the trial court failed to afford sufficient weight to the disparate sentences between himself and Shafer, where Shafer was serving only 20 years at 50%. Defendant noted that he was required to serve 48 years at 100%. Defendant asserted that the recent legislative amendment to the felony murder statute justified a reduced sentence. The trial court denied defendant's motion. This appeal followed.

¶ 30                                    II. Analysis

¶ 31    A. Constitutionality of the Proximate Cause Theory of Liability for Felony Murder

¶ 32    Defendant first argues that Illinois's proximate cause theory of liability for felony murder was unconstitutional as applied to him. Defendant maintains that the proximate cause theory lacks

---

[1]The trial court merged the guilty findings on all other counts into sentencing for one count of first degree felony murder.

an applicable *mens rea* required to constitute a "crime," creates a mandatory, irrebuttable presumption of guilt, and results in cruel and unusual punishment. We disagree.

¶ 33   Statutes are presumed to be constitutional, and, if reasonably possible, a court must construe a statute to affirm its constitutionality. *People v. Howard*, 2017 IL 120443, ¶ 24. The party challenging the validity of a statute has the burden to clearly establish that it is unconstitutional. *Id.* "An as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party." *People v. Thompson*, 2015 IL 118151, ¶ 36. The constitutionality of a statute is a question of law, which is subject to *de novo* review. *People v. Gray*, 2017 IL 120958, ¶ 57. The due process clause will invalidate a state criminal statute if that law offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *People v. Watson*, 2021 IL App (1st) 180034, ¶ 23.

¶ 34   It is well settled that a defendant may be found guilty of felony murder regardless of a lack of intent to commit murder. *People v. Jones*, 376 Ill. App. 3d 372, 387 (2007). "Felony murder derives its mental state from the underlying intended offense." *Id.* The purpose of felony murder is to deter individuals from committing foreseeable felonies by holding them responsible for murder if a death results. *Id.* Felony murder is premised on strict liability. *People v. Causey*, 341 Ill. App. 3d 759, 769 (2003). The State is not required to prove that defendant could foresee the death or intended to commit murder; instead, the State must show that defendant intended to commit the underlying felony. *Id.*

¶ 35   "In considering the applicability of the felony-murder rule where the murder is committed by someone resisting the felony, Illinois follow[ed] the 'proximate cause theory' " prior to the amendment of the statute in July 2021. *People v. Lowery*, 178 Ill. 2d 462, 465 (1997); 720 ILCS

11

5/9-1(a)(3) (West 2020). The focus under that theory was whether defendant's actions set in motion a chain of events that ultimately caused the decedent's death. *Lowery*, 178 Ill. 2d at 473. Under the proximate cause theory, liability attached for any death proximately resulting from the unlawful activity, notwithstanding the fact that the killing was committed by the one resisting the felony. *Id.* at 465.

¶ 36    The Illinois Supreme Court stated as follows regarding the application of the proximate cause theory:

"We believe that the analogies between civil and criminal cases in which individuals are injured or killed are so close that the principle of proximate cause applies to both classes of cases. Causal relation is the universal factor common to all legal liability. In the law of torts, the individual who unlawfully sets in motion a chain of events which in the natural order of things results in damages to another is held to be responsible for it.

It is equally consistent with reason and sound public policy to hold that when a felon's attempt to commit a forcible felony sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act. Thus, there is no reason why the principle underlying the doctrine of proximate cause should not apply to criminal cases. Moreover, we believe that the intent behind the felony-murder doctrine would be thwarted if we did not hold felons responsible for the foreseeable consequences of their actions." *Id.* at 466-67.

The reasoning in place behind the felony murder statute was to limit the violence accompanying forcible felonies by automatically subjecting individuals to a murder prosecution charge when

12

someone is killed during the commission of a forcible felony. *People v. Belk*, 203 Ill. 2d 187, 192 (2003).

¶ 37    Here, the jury found that defendant was a participant in the attempted commission of robbery and mob action—both forcible felonies. In participating in the robbery and mob action, defendant fired a shot near the doorway of Dixon's apartment. When defendant fired the shot, he suspected that Shafer was inside of the apartment armed with a gun. Defendant also knew that Johnson, Cook, and Faires were standing nearby the apartment. As a result of defendant's act of firing the shot, Shafer ran to a back bedroom of the apartment and returned fire. Faires, Shafer's girlfriend, was killed by the shot Shafer fired in response to the shot defendant fired. Thus, Faires would not have been shot and killed if defendant had not fired the shot in an attempt to commit the robbery or mob action. In our view, defendant could be charged with murder under the felony murder theory where an innocent victim was shot and killed during the commission of a forcible felony. This approach serves the purpose of the proximate cause theory. That is, to limit the violence accompanying forcible felonies.

¶ 38    We reject defendant's argument that the proximate cause theory lacks an applicable *mens rea* required to constitute a "crime." While the felony murder charges did not require an intent to kill, the charges did require the intent to commit the underlying felony. Thus, the State was still required to prove defendant's *mens rea*.

¶ 39    We also reject defendant's argument that the proximate cause theory constituted an unconstitutional, mandatory presumption of his guilt. "A presumption is a legal device which permits or requires the fact finder to assume the existence of a presumed or ultimate fact, after certain predicate or basic facts have been established." *People v. Watts*, 181 Ill. 2d 133, 141 (1998). The two categories of presumptions are permissive and mandatory. *Id.* at 142. Under a mandatory

13

presumption, the fact finder cannot reject the proffered presumption and, thus, the presumption may be conclusive or may shift the burden of proof. *Id.* With a mandatory presumption, the State is relieved of its burden of persuasion because the presumed element is removed from the case entirely if the State proves the predicate facts. *Id.* "Once such a presumption is triggered, the defendant is not allowed to attempt to rebut the connection between the proven and presumed facts." *Id.* Mandatory, irrebuttable presumptions have long been held to be unconstitutional. *Id.* at 144.

¶ 40    Here, the jury was instructed regarding first degree felony murder as follows:

> "A person commits the offense of first degree murder when he commits the offense of attempt to commit armed robbery, and the death of an individual results as a direct and foreseeable consequence of a chain of events set into motion by his commission of the offense of attempt to commit armed robbery.
>
> It is immaterial whether the killing is intentional or accidental, or committed by a third person trying to prevent the commission of the offense of attempt to commit armed robbery."

The jury was further instructed as follows:

> "A person commits the offense of first degree murder when he commits the offense of mob action and the death of an individual results as a direct and foreseeable consequence of a chain of events set into motion by his commission of the offense of mob action.
>
> It is immaterial whether the killing is intentional or accidental, or committed by a third person trying to prevent the commission of the offense of mob action."

¶ 41    Defendant argues that a reasonable juror would have understood these instructions as mandatory, in that once the juror found defendant attempted to commit robbery or mob action, he

14

or she had no choice but to find him guilty of felony murder. Defendant also maintains that he could not "rebut" the conclusive presumption that he was liable for Faires's death because courts have limited the availability of traditional defenses in felony murder cases. Defendant additionally argues that the mandatory presumption of guilt relieved the State of its burden to prove, beyond a reasonable doubt, any conceivable *mens rea* for Faires's death. This court previously rejected nearly identical arguments in *People v. Taylor*, 2024 IL App (5th) 220116-U, ¶¶ 35-36, *appeal denied*, No. 131438, 256 N.E.3d 995 (Ill. Mar. 26, 2025). Accordingly, we again reject these arguments in the present case.

¶ 42    Lastly, defendant argues that subjecting him to the same punishment as Shafer, in the absence of a *mens rea*, violates due process and the prohibition against cruel and unusual punishment. Again, as in *Taylor*, we reject defendant's argument. See *id.* ¶ 37. Thus, we hold that Illinois's proximate cause theory of liability for felony murder was not unconstitutional as applied to defendant.

¶ 43                    B. Amended First Degree Murder Statute

¶ 44    Defendant next argues that the amended first degree murder statute should have applied to abate his prosecution, as it amounted to a clarification of the felony murder rule. As the State correctly notes, this court rejected a nearly identical argument in *Taylor*, 2024 IL App (5th) 220116-U.

¶ 45    Section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2020)) is a general savings clause that, in interpreting, our supreme court has held forbids the retroactive application of substantive changes to criminal statutes. *Taylor*, 2024 IL App (5th) 220116-U, ¶ 42 (citing *People v. Gancarz*, 228 Ill. 2d 312, 319 (2008); *People v. Glisson*, 202 Ill. 2d 499, 505-07 (2002)). Consequently, the retroactive application of amendments or repeals in criminal statutes is permissible only if such

changes are procedural in nature. *Glisson*, 202 Ill. 2d at 507. A statutory amendment creates a presumption that it was intended to change existing law, but this presumption is not controlling. *People v. Stewart*, 2022 IL 126116, ¶ 20.

¶ 46    In considering whether the statutory change to the felony murder rule was procedural or substantive in *Taylor*, this court reasoned as follows:

"In this case, the statutory change to the felony murder rule is not of a procedural nature. This is a substantive change that seemingly limited the scope of liability for felony murder to participants in the underlying felony. In other words, it makes a substantive change from the broad felony murder rule, the proximate cause theory, which allowed for liability when the murder was committed by someone resisting the felony, to the agency theory, which requires the murder be committed by the offenders and co-offenders of the underlying felony.

As support for this conclusion, there is no indication in the legislative history that the legislature intended this change to be a clarification of the felony murder provision of the first degree murder statute. Instead, the legislative history seems to indicate the opposite. During the January 13, 2021, hearing, Representative Slaughter stated as follows regarding the change: 'The Bill narrows our broad felony murder rule to bring it in line with the majority of other states.' 101st Ill. Gen. Assem., House Proceedings, January 13, 2021, at 6-7 (statements of Representative Slaughter). Moreover, there was no indication that there was a conflict in the courts as to the meaning of the prior version of the felony murder provision and nothing to indicate that the amendment was made to resolve any conflict. We also note that by arguing that, if the shooting had occurred after the change in law, he could no longer be prosecuted for felony murder, the defendant is acknowledging

16

that the amendment narrowed the scope of liability. Accordingly, we conclude that the amendment, which defined conduct that is considered felony murder and narrowed the scope of liability, was a substantive rather than a procedural change." *Taylor*, 2024 IL App (5th) 220116-U, ¶¶ 44-45.

¶ 47 We find the reasoning set forth in *Taylor* controlling here. Accordingly, because the amendment was a substantiative rather than a procedural change it does not apply retroactively in the present case. Therefore, we reject defendant's argument.

¶ 48 Alternatively, defendant argues that adherence to the general rule that substantive changes do not apply retroactively would be repugnant in his case. Again, as the State correctly notes, this court rejected a nearly identical argument in *Taylor*.

¶ 49 This court, quoting section 1 of the Statute on Statutes, noted as follows: " 'In the construction of statutes, this Act shall be observed, unless such construction would be inconsistent with the manifest intent of the General Assembly or repugnant to the context of the statute.' " *Id.* ¶ 46 (quoting 5 ILCS 70/1 (West 2020)). This court went on to conclude that "it would not be repugnant to the context of the statute to prosecute the defendant based on the version of the felony murder provision that was in effect at the time the shooting was committed." *Id.* Again, we find *Taylor* controlling here and, thus, reach the same conclusion.

¶ 50                    C. Ineffective Assistance of Counsel

¶ 51 Defendant next claims that he received ineffective assistance of counsel where defense counsel failed to seek a jury instruction on withdrawal after presenting the theory that defendant outwardly withdrew from any potential felony before Shafer fired the shot that killed Faires. We disagree.

17

¶ 52    To establish a claim of ineffective assistance of counsel, the defendant must demonstrate that defense counsel's representation was (1) "below an objective standard of reasonableness" and (2) that defense counsel's performance was "prejudicial to the defense." *Strickland v. Washington*, 466 U.S. 668, 687-88, 692 (1984). "Neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have proceeded differently is sufficient to establish ineffective assistance of counsel." *People v. Trotter*, 299 Ill. App. 3d 535, 539 (1998) (citing *People v. Vera*, 277 Ill. App. 3d 130, 138 (1995)). The "[d]efendant must overcome a 'strong presumption that counsel's complained-of action or inaction was merely trial strategy.' " *Id.* (quoting *People v. Medrano*, 271 Ill. App. 3d 97, 100 (1995)).

¶ 53    "A defendant is entitled to have the jury instructed on any defense that is supported by the evidence." *Id.* at 539-40 (citing *People v. Everette*, 141 Ill. 2d 147, 156 (1990)). A person is not accountable, unless otherwise specified in the statute defining the offense, if he terminates his effort to promote or facilitate the commission of the offense before the commission of the offense and does one of the following: "(i) wholly deprives his or her prior efforts of effectiveness in that commission, (ii) gives timely warning to the proper law enforcement authorities, or (iii) otherwise makes proper effort to prevent the commission of the offense." 720 ILCS 5/5-2(c)(3) (West 2016). "Testimony that a defendant merely discontinued active participation before the offense was complete, without taking some step to 'neutralize' the effect of his conduct, will not entitle a defendant to a withdrawal instruction." *Trotter*, 299 Ill. App. 3d at 540. A defendant is not entitled to a withdrawal instruction where he introduces no evidence of his attempt to "neutralize the effect of his prior conduct" (*People v. Stachelek*, 145 Ill. App. 3d 391, 404 (1986)), or where the defendant testified that he participated in attacking the victim but left before the victim was killed. *People v. Cooper*, 30 Ill. App. 3d 326, 332 (1975).

18

¶ 54    Here, although defendant and other witnesses testified that defendant fled at some point after he fired the shot on the porch, he offered no evidence to show that he deprived his prior efforts of effectiveness in the commission of the offense. There was also no evidence indicating that defendant gave timely warning to law enforcement or that defendant made proper effort to prevent the commission of the offense. Instead, the evidence demonstrated that defendant fired a shot near the door of an apartment where he suspected Shafer was hiding armed with a gun. Defendant was aware that Cook, Johnson, and Faires were standing nearby when he fired the shot. Although the evidence demonstrated that defendant fled at some point after he fired the shot, there is no evidence indicating that defendant attempted to talk to Shafer to diffuse the situation or that defendant attempted to remove the other individuals, including Faires, from the situation he created. Instead, the evidence demonstrated that defendant attempted to cover up his involvement in the crime by running and having a discussion regarding burning clothing. Because there was no evidence to support withdrawal, defense counsel's failure to tender the withdrawal jury instruction did not constitute ineffective assistance of counsel.

¶ 55                              D. *Brady* Violation

¶ 56    Defendant contends that the State violated its obligation to disclose favorable defense evidence as required by *Brady*, 373 U.S. 83, when the State failed to inform the defense that its witness Lorrenda McWhorter sought leniency for her paramour in exchange for her testimony. We disagree.

¶ 57    "The State has a constitutional obligation to disclose evidence that is both favorable to the accused and 'material either to guilt or to punishment.' " *People v. Burt*, 205 Ill. 2d 28, 46-47 (2001) (quoting *Brady*, 373 U.S. at 87). "Evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

19

different.' " *Burt*, 205 Ill. 2d at 47 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "Therefore, in order to succeed in a *Brady* claim, the defendant must show that: (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching; (2) the evidence was either wilfully or inadvertently suppressed by the State; and (3) prejudice ensued to the defendant." *Id.* (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). This court reviews the trial court's ruling on the issue of whether a *Brady* violation occurred for manifest error; that is, where the error is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Beaman*, 229 Ill. 2d 56, 73 (2008).

¶ 58    Here, even assuming that the State suppressed the evidence, defendant failed to show that he was prejudiced as the result of the State's failure to disclose that McWhorter sought leniency for her paramour in exchange for her testimony. We agree with the State that this "potentially" impeaching information was cumulative. The State elicited information on direct examination of McWhorter regarding her extensive criminal history and past struggles with drug addiction, all of which called McWhorter's credibility into question. It is our view that the jury's consideration of evidence demonstrating that McWhorter sought leniency for her paramour in exchange for her testimony would not have altered the result of the trial. Thus, we conclude that the trial court did not manifestly err by denying defendant's posttrial *Brady* claim.

¶ 59                               E. Unconstitutional Sentence

¶ 60    Lastly, defendant maintains that his *de facto* life sentence for felony murder shocks the moral sense of the community and violates Illinois's proportionate penalties clause as applied to the facts of the case. Specifically, defendant argues that his 48-year sentence is constitutionally disproportionate to the offense, where he was convicted under a theory of felony murder no longer

20

valid in Illinois and where his sentence is more than twice as long as the person who shot and killed the victim. We disagree.

¶ 61    The proportionate penalties clause provides: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "To succeed on a proportionate penalties claim, the defendant must demonstrate either that the penalty is degrading, cruel 'or so wholly disproportionate to the offense that it shocks the moral sense of the community' or, that another offense containing the same elements has a different penalty." *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 69 (quoting *People v. Klepper*, 234 Ill. 2d 337, 348-49 (2009)). "[W]e review *de novo* whether a sentence violates the eighth amendment or the proportionate penalties clause." *People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 67.

¶ 62    Here, defendant was convicted of first degree murder, which had a sentencing range of 20 to 60 years' imprisonment. See 730 ILCS 5/5-4.5-20(a) (West 2020). Due to the jury's finding that defendant personally discharged a firearm, the trial court was required to impose a mandatory 20-year firearm enhancement. See 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2016). In addition to the mandatory 20-year firearm enhancement,[2] the court sentenced defendant to 28 years' imprisonment for first degree murder—a sentence eight years above the minimum but 32 years below the maximum sentence.

¶ 63    Defendant argues that his sentence shocks the moral sense of the community because he was convicted under a theory of felony murder which is no longer valid in Illinois. We acknowledge that, in 2021, the legislature amended the application of the felony murder statute to

---

[2]Defendant does not specifically challenge the imposition of the mandatory 20-year firearm enhancement.

21

exclude deaths caused by third parties during the commission of a felony. While we acknowledge this statutory change, we have concluded that the amendment was prospective, rather than retroactive. As a result, we conclude that defendant was properly sentenced in accordance with the law in effect at the time of the murder.

¶ 64 We reject defendant's assertion that the principles of *People v. Leon Miller*, 202 Ill. 2d 328 (2002), apply to the instant case. In *Miller*, our supreme court held that a juvenile defendant's natural life sentence violated the proportionate penalties clause as applied to that defendant where the sentence "grossly distort[ed] the factual realities of the case and [did] not accurately represent defendant's personal culpability such that it shock[ed] the moral sense of the community." *Id.* at 340. As defendant recognizes, he was not a juvenile at the time he committed the crime in the present case. In fact, defendant was 34 years old at the time. For this reason, we do not find defendant's reliance on *Miller* persuasive where that case involved a juvenile defendant.

¶ 65 As the State correctly notes, the trial court, in denying defendant's motion to reconsider sentence, stated that it considered the objective of restoring defendant to useful citizenship. The court noted that defendant had "been a better citizen while in custody than while out of custody." The court went on to state that there was "little indication" of defendant's "ability to be a good citizen." The court concluded by stating that the evidence demonstrated that defendant "maintained a lifestyle of drugs and guns." Given our conclusion that the court correctly applied the statutory scheme in effect at the time defendant committed the charged crimes and the court's consideration of the objective of restoring him to useful citizenship, we conclude that defendant's sentence did not shock the moral sense of the community.

¶ 66 Defendant additionally argues that his sentence shocks the moral sense of the community because his sentence was nearly twice that imposed against Shafer, who fired the shot that killed

Faires. However, as the State correctly notes, Shafer was convicted of second degree murder, not felony murder. Accordingly, defendant was convicted of an entirely different crime that involved a different sentencing scheme. In ruling on defendant's motion to reconsider sentence, the trial court addressed the disparity in a written order as follows:

"While it is true that Todd Shafer actually fired the gun that killed Faires, that does not automatically require that he receive a greater sentence than [defendant]. Shafer was ultimately sentenced to 20 years for second-degree murder and a consecutive 7 years for possession of a firearm by a felon.

[Defendant] was convicted of felony murder. The [d]efendant's conduct and his criminal history, amongst other factors, justified the sentence imposed. His actions were significant in causing the death of Ciarra Faires."

¶ 67   Given the differences between the crimes charged, we conclude that the disparity in the sentences of defendant and Shafer does not shock the moral sense of the community. We note that defendant was sentenced to 28 years for first degree murder, whereas Shafer was sentenced to 20 years for second degree murder. In our view, such disparity does not shock the moral sense of the community.

¶ 68   Therefore, we hold that defendant's sentence does not violate Illinois's proportionate penalties clause and his as-applied constitutional challenge fails.

¶ 69                                    III. Conclusion

¶ 70   For the foregoing reasons, we affirm the judgment and sentence of the Coles County circuit court.

¶ 71   Affirmed.

23