NOTICE
Decision filed 02/17/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 231193-U

NO. 5-23-1193

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Lawrence County. |
| | ) | |
| v. | ) | No. 23-CF-84 |
| | ) | |
| ANTRON D. WILLIAMS, | ) | Honorable |
| | ) | Matthew J. Hartrich, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Cates and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's convictions and sentences for methamphetamine delivery and possession of cannabis, where the trial court did not err by denying defendant's motion to suppress evidence; defense counsel was not ineffective for failing to move to dismiss new and additional conspiracy charges on grounds of compulsory joinder and speedy trial; the presence of a non-party witness at trial was invited error and did not prejudice defendant; and the trial court did not abuse its discretion by sentencing defendant to 20 years in prison for methamphetamine delivery. We vacate defendant's conviction and sentence for methamphetamine conspiracy, where conspiracy was an inchoate offense of methamphetamine delivery.

¶ 2    Following the denial of a motion to suppress and a jury trial in the circuit court of Lawrence County, defendant, Antron D. Williams, was found guilty of methamphetamine conspiracy (720 ILCS 646/65(a) (West 2022)), methamphetamine delivery (*id.* § 55(a)(2)(E)), methamphetamine possession (*id.* § 60(b)(5)), and possession of cannabis (720 ILCS 550/4(c) (West 2022)). The trial court merged the methamphetamine possession count into the methamphetamine delivery count

1

and sentenced defendant to three concurrent prison sentences of 20 years (methamphetamine conspiracy), 20 years (methamphetamine delivery), and 1 year (possession of cannabis), to be followed by 18 months (methamphetamine offenses) and 6 months (cannabis offense) of mandatory supervised release (MSR). Defendant appeals, arguing that (1) the trial court erred by denying his motion to suppress where the search was based on an alert from an unreliable drug-detection dog; (2) he received ineffective assistance of counsel where defense counsel did not file a motion to dismiss new and additional conspiracy charges on compulsory joinder and speedy trial grounds; (3) he was denied a fair trial where a key witness sat with the prosecution throughout the trial; (4) the court improperly relied on factors inherent in the offense at sentencing and imposed an excessive sentence; and (5) he was improperly convicted and sentenced to the inchoate offense of methamphetamine conspiracy and the principal offense of methamphetamine delivery. For the following reasons, we vacate defendant's conviction and sentence for methamphetamine conspiracy but otherwise affirm.

¶ 3                                        I. BACKGROUND

¶ 4       On May 9, 2023, law enforcement conducted a traffic stop of a vehicle driven by defendant in Lawrenceville, Illinois. Following an open-air sniff by a canine unit, law enforcement searched the vehicle and found suspected methamphetamine and cannabis. Defendant and his passenger, Sam Inman, were arrested and transported to jail following the search.

¶ 5       On May 12, 2023, the State charged defendant by information with one count of methamphetamine delivery (720 ILCS 646/55(a)(2)(E) (West 2022)), a Class X felony, and one count of delivery of cannabis (720 ILCS 550/5(d) (West 2022)), a Class 3 felony. The trial court subsequently appointed counsel to represent defendant.

¶ 6     On August 8, 2023, defense counsel filed a motion to suppress evidence, alleging that the traffic stop, detention, arrest, and search were unlawful. Defense counsel alleged that law enforcement stopped and searched the vehicle without a warrant, without the observation of any crime or ordinance violation, and without any other articulable circumstances that would warrant a reasonable and prudent person to believe a crime had been committed, was being committed, or was about to be committed. Defense counsel, thus, requested the suppression of the evidence obtained during the stop, including a digital scale, a white plastic bag containing a crystal substance, a black plastic bag containing a bag of green leafy substance, and a cell phone.

¶ 7     On August 30, 2023, the trial court held a hearing on the motion to suppress. Nicholas Earnst, an officer employed by the Lawrenceville Police Department, testified for the State. Officer Earnst testified that he stopped a white Chevrolet Suburban for failing to use a turn signal at 11:39 p.m. on May 9, 2023. Officer Earnst approached the vehicle on the passenger side and observed Inman, an individual whom he was familiar with and had stopped on prior occasions, in the passenger seat. In speaking with Inman, Earnst observed that Inman was less talkative than usual, which Earnst found suspicious. After speaking with Inman, Officer Earnst spoke to defendant, who was driving the vehicle. Officer Earnst requested defendant's license and registration. Officer Earnst observed that defendant appeared nervous and was shaking when he handed Officer Earnst the requested documents. Based on his observations, Officer Earnst requested a canine unit.

¶ 8     Officer Earnst testified that he did not observe any contraband in plain view, and he did not detect the odor of alcohol or drugs when he spoke with defendant and Inman. Officer Earnst noted that law enforcement previously investigated Inman for narcotics involvement but there was no active investigation at the time of the stop.

3

¶ 9 Officer Earnst testified that he returned to his patrol car with the vehicle registration and defendant's driver's license. As Officer Earnst wrote a warning for failure to signal, he learned from dispatch that defendant's license was suspended. Two additional officers arrived on scene, including Deputy Daegan York and the canine unit. While Officer Earnst finished writing the warning, Deputy York advised that the canine alerted to the presence of narcotics in the vehicle.

¶ 10 Officer Earnst testified that he next approached the vehicle, advised defendant that his license was suspended, and placed defendant under arrest. When defendant was advised by Officer Earnst that he planned to search the vehicle, defendant became irate. Following a brief argument, defendant complied with Officer Earnst's instruction to sit in his patrol vehicle. Officer Earnst requested that Inman exit the vehicle and Officer Earnst conducted a pat down of Inman for officer safety without Inman's consent.

¶ 11 Officer Earnst testified that his search of the vehicle revealed several items of interest. Specifically, Officer Earnst found the following: a digital scale in the center console; a crystal substance in the front passenger seat and on the back floorboard; a bag of crystal substance that field-tested positive for methamphetamine in the plastic lining between the interior and exterior walls of the vehicle; and a bag of green leafy substance that field-tested positive for cannabis in the plastic lining between the interior and exterior walls of the vehicle.

¶ 12 Officer Earnst testified that defendant and Inman were arrested and transported to jail at approximately 12:44 a.m. on May 10, 2023. The vehicle was towed, which was typical following an arrest for driving on a suspended license.

¶ 13 Deputy York, a deputy employed by the Lawrence County Sheriff's Office, testified for the State. Deputy York became a canine officer for the sheriff's department after he completed training from January 16, 2023, to February 24, 2023. The State submitted into evidence the canine

4

team's daily training summary for Deputy York and his narcotics detection dog, Lucian. Deputy York described the training as "a mixture of lecture and hands-on training, going over K9 case law, policy, procedures, K9 maintenance and care and the hands-on training in narcotics, human apprehension, human tracking and obedience." Lucian was certified and trained to detect methamphetamine, cocaine, crack cocaine, and heroin. Lucian was not certified to detect cannabis. The State submitted into evidence the narcotics detection certification issued to Deputy York and Lucian by the Illinois Law Enforcement Training and Standards Board. The documentation submitted by the State indicated that Lucian completed "377-and-a-half hours" of training. Deputy York testified that he began using Lucian for open-air sniffs around vehicles after receiving the certification.

¶ 14    Deputy York testified that he responded to a canine request from Officer Earnst on May 9, 2023. Once Deputy York arrived on scene, he "spoke to Officer Earnst to obtain the probable cause for the stop, and then [he] retrieved K9 Luci[a]n from [his] patrol vehicle." Deputy York estimated that he retrieved Lucian approximately 30 seconds after he arrived on scene. Deputy York next conducted an open-air sniff of the vehicle. Deputy York explained that Lucian was "placed 5 to 6 feet downwind for roughly 30 seconds" before Deputy York gave "a narc command, which is the command to begin the open-air sniff." Deputy York ran Lucian "counterclockwise around the vehicle on the first rotation and then clockwise on the second rotation." Deputy York explained that "[r]unning two rotations" provided him "ample opportunity to observe the changes and behavior of the dog."

¶ 15    Deputy York testified that Lucian alerted to the presence of narcotics in the vehicle on May 9, 2023. Deputy York described the vehicle as "a white Chevrolet SUV." Deputy York recalled a driver and passenger were inside the vehicle at the time he conducted the open-air sniff. Lucian

5

alerted to the presence of narcotics by sitting down, which was one of Lucian's trained final responses. Lucian "got an indication on the driver's side and passenger side." Specifically, Lucian alerted at the driver and passenger side door seam, "the B pillar." When asked what occurred after Lucian alerted, Deputy York stated, "After the first indication, I ran him back on a clockwise approach. On the second indication, he was given his reward." Lucian's reward was a tennis ball. Deputy York explained that "[t]he ball is kept away during the running phases or the open-air sniff around the vehicle" and Lucian is tossed the tennis ball after Lucian alerts to the presence of narcotics. Deputy York confirmed that Lucian would not have received the tennis ball if he did not alert to the presence of narcotics. When asked if he was concerned that Lucian responded to the tennis ball rather than alerting to narcotics, Deputy York responded, "No."

¶ 16    Deputy York testified that he next advised Officer Earnst that Lucian had alerted on the vehicle. Deputy York returned Lucian to his patrol vehicle and waited for Officer Earnst to approach the suspect vehicle. Deputy York began assisting Officer Earnst with a search of the driver's seat area until more officers arrived on scene. Deputy York then remained on scene as a "cover" officer. Deputy York did not locate any narcotics during his brief search of the vehicle.

¶ 17    On cross-examination, Deputy York was asked if Lucian ever alerted when there were not illegal drugs found in a vehicle. Deputy York responded, "In the initial first-week phases in odor implementation, yes." Deputy York later clarified that Lucian had alerted to the presence of narcotics when none were present "[i]n real-world situations" on prior occasions. Deputy York was unable to provide an exact or estimated number of the times Lucian had alerted when no narcotics were present. Deputy York denied that Lucian alerted only to receive the tennis ball, stating that Lucian "associates the odor of narcotics with the reward." When asked if Lucian could learn through repetition that receipt of the tennis ball follows the act of sitting, Deputy York

6

responded, "The continuous training prevents that from happening." When asked why Lucian was only given the tennis ball if he alerted on a vehicle, Deputy York responded, "If you were—if I were to reward him when he did not indicate, that would be rewarding bad behavior." Deputy York confirmed that there were also "real-world" occasions where Lucian conducted open-air sniffs and did not alert on a vehicle. Deputy York testified that Lucian jumped up on the driver's side door of the vehicle during the open-air sniff. Deputy York's patrol vehicle was equipped with a video camera but the camera was not positioned to record the open-air sniff of the vehicle defendant was driving on May 9, 2023.

¶ 18    On redirect, Deputy York testified that there were "numerous possibilities as to why contraband was not found" in a vehicle following an alert by Lucian. Deputy York explained that the narcotics could have been present in the vehicle but not found by law enforcement because they were well concealed. Deputy York further explained that Lucian could detect residual odor, meaning that narcotics were previously inside of the vehicle but had since been removed.

¶ 19    After considering the evidence, the trial court noted that Officer Earnst observed a traffic violation and that Officer Earnst requested the canine unit before he wrote a warning for defendant's failure to signal. The court additionally found that the training log demonstrated "sufficient training for the K9 unit." The court concluded that the alert of the canine unit qualified as probable cause for the search of the vehicle. Thus, the court denied the motion to suppress.

¶ 20    On September 5, 2023, the State filed an amended information, realleging the original two counts of methamphetamine delivery (count I) and delivery of cannabis (count II) but adding four additional counts. Specifically, the State added one count of methamphetamine possession (720 ILCS 646/60(b)(5) (West 2022)) (count III), a Class X felony; one count of possession of cannabis (720 ILCS 550/4(c) (West 2022)) (count IV), a Class 4 felony; one count of methamphetamine

7

conspiracy (720 ILCS 646/65(a) (West 2022)) (count V), a Class X felony; and one count of cannabis conspiracy (720 ILCS 5/8-2(a) (West 2022)) (count VI), a Class 4 felony.

¶ 21    On September 19, 2023, defense counsel filed a motion to strike the amended information, alleging that the information added offenses with elements not presented at the preliminary hearing. The trial court denied the motion at a hearing held on October 11, 2023, finding that the new charges were filed within 120 days and that an additional preliminary hearing was unnecessary. Also, at the hearing held on October 11, 2023, defendant rejected the State's offer of a plea deal to an amended count of methamphetamine delivery, a Class 1 felony, with a sentencing recommendation of eight years to be served at 50%.

¶ 22    On October 16, 2023, the matter proceeded to a jury trial. When the State was provided an opportunity to question the potential jurors, the prosecutor introduced himself and Officer Earnst, stating that Officer Earnst was "a witness in the case." Following opening statements, defense counsel stated, "Your Honor, counsel have discussed it with the court off the record, but just for the record, I do want to move that any witnesses be excluded from the courtroom." The trial court responded, "Except for Officer Earnst." Defense counsel then stated, "Other than Officer Earnst pursuant to local practice, yes."

¶ 23    Officer Earnst and Deputy York testified for the State. Their testimonies were consistent with those provided at the hearing on the motion to suppress. Officer Earnst added that he submitted bags containing crystal and green leafy substances to the Illinois State Police (ISP) laboratory for further testing and analysis. Officer Earnst also added that he obtained a cell phone from defendant during the stop. Officer Earnst additionally testified that Inman's paramour, Lequia Patterson, arrived on the scene during the stop and was yelling. Lequia was also known as "Bird."

8

The vehicle driven by defendant was registered to someone with the last name "Gray" in Raleigh, North Carolina.

¶ 24 James White, the Lawrenceville Police Chief, testified for the State. White brought defendant's cell phone to David Mullins, a police officer employed by the Robinson Police Department. Officer Mullins transported the cell phone to Bobby Wallace in Jefferson County. Joel Gray, a forensic scientist in drug chemistry employed by the ISP, testified that he analyzed the crystal and green leafy substances recovered from the vehicle and determined that the substances were methamphetamine and cannabis.

¶ 25 Bobby Wallace, the Jefferson County Sheriff, testified for the State. He was certified as an expert in cellphone data extraction. Wallace examined defendant's cell phone and extracted call logs and messages. Over defendant's objection, the State introduced four exhibits depicting the calls and messages extracted from the cell phone obtained from defendant. The first exhibit included multiple Facebook messages between the Facebook accounts "Luc Gater" and "SAm Inman" on May 1, 2023. The "Luc Gater" account was associated with the cell phone recovered from defendant and defendant later testified that his Facebook account was "Luc Gater." The Luc Gater account sent the SAm Inman account a message asking, "how the money looks down there," and the SAm Inman account responded, "Great." The Luc Gater account then stated, "Boe, they say ya[']ll hot right now, boe." The SAm Inman account responded, "Lol that's y ya can take over." The Luc Gater account responded, "I'm lying back. I don[']t do that hot boy shit anymore." The second exhibit was a log of phone calls between the Gater and Inman accounts from May 8, 2023, and May 9, 2023. The third exhibit was a log of phone calls between defendant's cell phone and a number labeled as "Clow" on May 9, 2023, including an outgoing call from defendant's phone to Clow at 9:30 a.m. and another outgoing call to Clow at 11:42 p.m. The fourth exhibit

9

included multiple text messages exchanged between defendant's cell phone and "Clow" on May 9, 2023, and May 10, 2023. The exhibit indicated that Clow sent a message to defendant's phone on May 9, 2023, at 11:15 p.m. that stated, "Bring dat ice if mine." The exhibit further indicated that on May 10, 2023, at 12:33 a.m., defendant's phone responded, "Man bird making it hard…they find that shit in the trunk." Wallace was unable to identify who sent the messages or made the calls and could only state that the messages and calls came from the cell phone recovered from defendant. Wallace selected the central time zone for the call and message times, but he did not know if the calls or texts originated in that time zone. Wallace also discovered a May 4, 2023, message sent from Toyota to defendant's cell phone that advertised a job in Illinois that paid $19.05 per hour.

¶ 26 Following Wallace's testimony, the State rested. Defendant moved for a directed verdict, which the trial court denied.

¶ 27 The defense first called Chris Radford, who was employed by the ISP. Radford conducted a fingerprint analysis on the plastic bags containing the methamphetamine and cannabis. Defendant's prints did not match any prints found on the bags.

¶ 28 Inman next testified for the defense. Inman resided in Lawrenceville for approximately six years. Defendant was Inman's cousin. Defendant indicated that he had plans to visit Lawrenceville for several weeks leading up to May 9, 2023. Inman believed defendant planned the trip to visit his brother, who also lived in Lawrenceville, and to obtain a job. Inman met up with defendant the day he arrived in Lawrenceville. According to Inman, defendant walked to Inman's house at approximately 12 p.m. on May 9, 2023. Defendant and Inman spent the entire day together. Later that evening, defendant and Inman, along with others, decided to go to a local pool hall. Inman rode with defendant's brother, "Chucky," to the pool hall but the hall was closed. Inman dropped

10

Chucky off at another bar and went to a friend's house. When Inman attempted to leave, his "car wouldn't run." Inman believed he "grabbed the wrong set of keys." Inman explained that he had two keys to his car. Inman added that "[o]ne crank right up, the other one gave me a little hesitation to crank it up." Inman called defendant and defendant advised that he would borrow a car and come get Inman. Shortly thereafter, defendant arrived and gave Inman a ride to his house to get the other key. Inman claimed that he and defendant were pulled over on the way back to Inman's car.

¶ 29    Inman testified that he had been stopped by law enforcement over 20 times since he lived in Lawrenceville. Inman explained that law enforcement drove by his home multiple times the evening of May 9, 2023. Before law enforcement pulled them over, Inman told defendant to use all of his turn signals. Inman believed law enforcement would pull them over even if defendant followed all the traffic laws because "[t]hat's what they do." Inman recalled that defendant called the owner of the vehicle shortly after the stop. Inman also recalled that the canine unit arrived while Officer Earnst was in his patrol car. According to Inman, the dog walked around the vehicle twice and "jumped up on [defendant]" in the driver's seat. Inman also claimed that the officer threw the tennis ball at the vehicle. Officer Earnst then advised defendant that his license was "messed up" and removed defendant from the vehicle. Officer Earnst then directed Inman to get out of the vehicle. Officer Earnst then searched the vehicle and found drugs. Inman testified that he did not know there were drugs in the vehicle or where the drugs came from.

¶ 30    On cross-examination, Inman testified that his Facebook account was Sam Inman. He did not know if defendant's Facebook account was Luc Gater. Inman did not know why defendant came to Lawrenceville, but he assumed defendant came to see his brother. Inman did not know if defendant drove the white Chevy Suburban from South Carolina. When defendant arrived at

11

Inman's house on May 9, 2023, Lequia and her sisters were at Inman's home. Defendant's brother was also at Inman's home. They stayed at Inman's home until approximately 10 p.m., when several other individuals came over and expressed an interest in going to play pool. Inman claimed that the Chevy Suburban pulled up to his house around 10 p.m., but he did not know who was inside of the vehicle. Inman did not recognize any of the messages between the Sam Inman Facebook account and the Luc Gater Facebook account. He did not know anyone by the name of "Clow" or "C-low."

¶ 31     Defendant testified on his own behalf. Defendant testified that he lived in South Carolina with his paramour and their six-year-old son. Defendant rode with his cousin, Damian Patterson, from South Carolina to Illinois. Defendant claimed Patterson dropped defendant off in Illinois on Patterson's way to see his father in Tennessee. Defendant claimed he wanted to see his brother, who lived in Illinois. Defendant also wanted to explore job opportunities in Illinois, including a job at Toyota where he could make $17 dollars an hour. Defendant also had other family in Lawrenceville, including Inman.

¶ 32     Defendant testified that he walked to Inman's house after he arrived in Lawrenceville on May 9, 2023. Defendant clarified that the State had incorrectly been using the name "Clow" when the individual was actually called "C-Low." C-Low directed defendant to Inman's house. Defendant stayed at Inman's house all day. Later that evening, several other individuals arrived at Inman's house and everyone decided to go somewhere to play pool. The Chevy Suburban arrived at Inman's house when the other individuals arrived. Defendant got in a car, a gray Chrysler 300, with one of the individuals, who was named "Cave." When they learned the pool hall was closed, defendant had "Cave" drop him off where Inman was located.

¶ 33    Defendant testified that after he arrived, defendant observed that "[Inman] and him, the white Suburban and this lady was in the house talking." Defendant testified, "The dude name is C-LOW, by the name of C-LOW, he was in the house talking." Defendant claimed he went outside because he did not "want to [be] surrounded with all that foolishness." Defendant clarified that they were "talking about other people and [he] didn't want to be a part of that so [he] went outside." Inman came out shortly thereafter and advised defendant that he needed to go to his house but "[h]is car wasn't crankin'." Defendant claimed he told Inman that he was not getting in Inman's truck because Inman had stated that law enforcement did not like him. Defendant claimed they asked "old boy" to use his car to take Inman back to Inman's house. Defendant drove to Inman's house and sat on the porch while Inman went inside. Defendant noticed that law enforcement repeatedly passed by Inman's house. Inman advised defendant that law enforcement always pulled Inman over without a reason. Inman retrieved his keys and asked defendant to drive him back to his car.

¶ 34    Defendant testified that he was pulled over while driving Inman back to his car. Defendant called C-Low to ask where the vehicle registration was located. Defendant gave Officer Earnst his license and the registration. Defendant claimed he was nervous about making any sudden movements with law enforcement present. Shortly thereafter, Officer Earnst advised defendant that his license was suspended before the canine unit arrived. The canine unit went around the vehicle and jumped towards defendant. Officer Earnst then placed defendant in his patrol car. Officer Earnst advised that the canine had alerted and Earnst began searching the vehicle. Defendant claimed Officer Earnst handcuffed him and took his cell phone before Officer Earnst placed him in the patrol car. Defendant denied that he knew drugs were present in the vehicle.

13

¶ 35    On cross-examination, defendant confirmed that his Facebook account was Luc Gater. Defendant claimed Inman did not know defendant was coming to Lawrenceville on May 9, 2023, and that he planned to surprise Inman. Patterson dropped defendant off at defendant's brother's apartment, so defendant did not have a vehicle in Lawrenceville. When asked about the message he sent to Inman stating, "you all hot right now," defendant explained that he was referring to Inman's recent arrest for possession of a concealed weapon. Defendant explained that when he asked Inman, "how the money look down there," he was referring to job opportunities. Defendant denied that when Inman sent the message indicating that defendant could take over, Inman was referring to defendant taking over Inman's drug-dealing business. Defendant claimed he responded that he did not do "hot boy shit anymore," which meant he did not want to get into trouble. Defendant explained that he called C-Low after he was pulled over. Defendant claimed C-Low, whose real name was Carlos Badger, was also from South Carolina but had moved to Kentucky. Defendant acknowledged various text messages exchanged between his phone and Badger's phone. Defendant did not know why Badger sent him a message that stated, "Bring that ice if mine." Defendant did not even recall receiving that message. Defendant claimed he did not know what methamphetamine or cannabis were until he was charged in the present case.

¶ 36    The State called Officer Earnst in rebuttal. Officer Earnst testified that he did not take defendant's cell phone before he placed him in his patrol car. Officer Earnst transported defendant to jail at 12:44 a.m.

¶ 37    Following deliberations, the jury found defendant guilty of methamphetamine delivery, methamphetamine conspiracy, methamphetamine possession, and possession of cannabis. The jury found defendant not guilty of delivery of cannabis and cannabis conspiracy.

14

¶ 38    On November 13, 2023, defendant filed a motion for new trial, alleging, *inter alia*, that the trial court erred by denying his motion to suppress. The trial court denied the motion prior to sentencing.

¶ 39    On November 22, 2023, the trial court held a sentencing hearing. The court first indicated that it would consider the presentence investigation (PSI) report "and everything in it" in rendering its sentencing decision. The PSI report indicated that defendant resided in South Carolina with his girlfriend and six-year-old son. Defendant had previously worked for a landscaping company and at a factory. Defendant was diagnosed with schizophrenia and multiple personality disorder around the age of 14 or 15. As a result, he spent two years in a mental health facility. Defendant had a 2014 criminal conviction for pointing a firearm at and intimidating a court official, which resulted in probation. Defendant also had a 2003 juvenile burglary offense, a 2006 assault on a correctional employee conviction, and a 2010 possession of a stolen gun conviction.

¶ 40    Defendant's girlfriend, Katyra Brown, testified on defendant's behalf. Katyra testified that defendant was "a wonderful father" to their six-year-old son. Katyra claimed that their son cried every day because he missed his father. Katyra also claimed that their son began acting out in school due to defendant's absence. Katyra further claimed that she was struggling due to defendant's absence.

¶ 41    Defendant then made a statement in allocution. Defendant initially apologized for pushing chairs over following the trial court's ruling on his motion to suppress. Defendant claimed he came to Illinois to find a job to better himself and provide for his son. Defendant claimed he changed his life after his 2014 conviction. Defendant also expressed that he loved his son and did not want to be taken from him.

15

¶ 42    Following the State's argument, defense counsel noted that "the methamphetamine offenses under one act one crime principles, the defendant could only be sentenced to one of those." Defense counsel commented, however, that, "given that any sentencing would be concurrent, that doesn't change a lot here."

¶ 43    Prior to announcing its sentence, the trial court stated that it merged count I (methamphetamine delivery) and count III (methamphetamine possession) under the one-act-one-crime doctrine. The court concluded that count V (methamphetamine conspiracy) did not merge, so the court would be issuing sentences on counts I (methamphetamine delivery), IV (possession of cannabis), and V (methamphetamine conspiracy).

¶ 44    In considering the factors in aggravation, the trial court found that defendant's conduct "did threaten serious harm to the community by distribution of a very large quantity of methamphetamine in the community. I believe it was slightly more than a pound." The court also noted that "defendant was likely to receive compensation for committing the offense" and that he had "a history of criminal activity." The court also found that "the sentence [was] necessary to deter others from committing the same offense."

¶ 45    In considering the factors in mitigation, the trial court found that defendant's conduct did not specifically cause serious physical harm to another. The court also considered that defendant's "incarceration would have an impact on his minor child."

¶ 46    The trial court sentenced defendant to 20 years for methamphetamine delivery (count I), to be served at 75% and followed by 18 months of MSR. The court sentenced defendant to one year for possession of cannabis (count IV), to be served at 50% and followed by six months of MSR. The court sentenced defendant to 20 years for methamphetamine conspiracy (count V), to be

served at 75% and followed by 18 months of MSR. The prison sentences were to run concurrently. Defendant filed a timely notice of appeal.

¶ 47                                     II. ANALYSIS

¶ 48     On appeal, defendant argues that (1) the trial court erred by denying his motion to suppress, where the search was premised on an unreliable drug-detection dog; (2) defense counsel provided ineffective assistance by failing to move to dismiss the additional conspiracy charges on compulsory joinder and speedy trial grounds; (3) he was denied a fair trial where Officer Earnst was permitted to remain in the courtroom and sit at the State's table throughout the trial; (4) the court improperly relied on factors inherent in the offense and imposed an excessive sentence; and (5) his conspiracy conviction should be reversed where he was also convicted of the principal offense. We address defendant's contentions in turn.

¶ 49                              A. Motion to Suppress

¶ 50     Defendant first argues that the trial court erred by denying his motion to suppress, where the sole basis for the search was an alert by an unreliable drug-detection dog. We disagree.

¶ 51     We review the trial court's ruling on a motion to suppress evidence under a two-part standard of review. *People v. Harris*, 228 Ill. 2d 222, 230 (2008). The court's factual findings are entitled to deference and will be reversed only if they are against the manifest weight of the evidence. *Id.* We also defer to the court's credibility findings unless they are manifestly erroneous. *People v. Perez*, 288 Ill. App. 3d 1037, 1043 (1997). However, the court's ultimate ruling as to whether suppression is warranted is reviewed *de novo*. *Id.* Evidence adduced at the suppression hearing and the trial may be considered on review. *People v. Richardson*, 234 Ill. 2d 233, 252 (2009). It is "well settled that the defendant bears the burden of proof on a motion to suppress evidence (725 ILCS 5/114-12(b) (West 2012)), and only if defendant makes a *prima facie* showing

17

that the evidence was obtained in an illegal seizure does the burden shift to the State to provide evidence to counter the defendant's *prima facie* case." *People v. Reedy*, 2015 IL App (3d) 130955, ¶ 45.

¶ 52     The fourth amendment of the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. This constitutional guarantee applies to searches and seizures conducted by the states through the due process clause of the fourteenth amendment. U.S. Const., amend. XIV. "The fourth amendment provides the same level of protection as the search-and-seizure provision in the Illinois Constitution [citation]." *People v. Haycraft*, 349 Ill. App. 3d 416, 422-23 (2004). The fruits of a search or seizure may be suppressed if a search or seizure is in violation of the fourth amendment. *People v. Avdic*, 2023 IL App (1st) 210848, ¶ 22. The objective of the exclusionary rule is to safeguard all of us by deterring law enforcement from committing violations of the fourth amendment. *Terry v. Ohio*, 392 U.S. 1, 12 (1968) ("the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct").

¶ 53     Searches conducted without prior approval by a judge or magistrate are generally considered unreasonable under the fourth amendment with only a few specific and clearly defined exceptions. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). A warrantless search of an automobile is one such exception, due to the vehicle's transient nature and the challenge of obtaining a warrant before it can leave the jurisdiction. *People v. Hill*, 2020 IL 124595, ¶ 21. Probable cause is required to conduct a search of a vehicle without a search warrant. *Id.* ¶ 22.

¶ 54     "A trained drug-detection dog's alert on a vehicle is an acceptable method to establish probable cause." *People v. Garcia*, 2025 IL App (2d) 240449, ¶ 34 (citing *People v. Webb*, 2023

18

IL 128957, ¶ 24; *People v. Campbell*, 67 Ill. 2d 308, 315-16 (1977)). "The ultimate question is 'whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.' " *Id.* (quoting *Florida v. Harris*, 568 U.S. 237, 248 (2013)).

¶ 55 In the present case, defendant failed to meet his burden of proving that law enforcement lacked probable cause to conduct a search of the vehicle. Specifically, defendant failed to show that Lucian was an unreliable drug-detection dog. Defense counsel questioned Deputy York regarding Lucian's drug-detection training and false alerts on cross-examination. Deputy York acknowledged that Lucian had previously alerted to the presence of drugs when no drugs were found during a search. However, Deputy York explained that there were various reasons this could have occurred, including well-concealed drugs or the residual odor of drugs that had since been removed from the vehicle. Deputy York also testified that Lucian had not alerted to the presence of drugs during an open-air sniff on at least one occasion. Moreover, Deputy York testified that Lucian had alerted to the presence of drugs when drugs were found in the vehicle on multiple occasions. When defense counsel asked Deputy York if Lucian alerted only to obtain the tennis ball as a reward, Deputy York responded in the negative. Deputy York testified that Lucian was trained to associate the odor of narcotics with his reward and that Lucian's continuous training prevented him from falsely alerting to obtain the tennis ball. In our view, defense counsel's cross-examination, though thorough, was insufficient to demonstrate that Lucian's alert was unreliable. Accordingly, defendant failed to meet his burden of demonstrating that law enforcement lacked probable cause because Lucian's alert was unreliable.

¶ 56 Even assuming *arguendo* that defense counsel's cross-examination was sufficient to make a *prima facie* case, we would agree with the State that it presented sufficient evidence to

19

demonstrate that Lucian was reliable. In addition to Deputy York's testimony regarding the training that both he and Lucian underwent from January 16, 2023, to February 24, 2023, the State submitted documents from Lucian's training that demonstrated Lucian completed 377 hours prior to receiving certification. In our view, this evidence was sufficient to demonstrate that Lucian was a reliable, trained drug-detection dog.

¶ 57    Therefore, we conclude that the trial court did not err by finding that Lucian's alert gave law enforcement probable cause to search the vehicle. Accordingly, we hold that the court did not err by denying defendant's motion to suppress evidence.

¶ 58                    B. Compulsory Joinder and Speedy Trial

¶ 59    Defendant argues that trial counsel was ineffective for failing to move to dismiss the additional conspiracy charges[1] on speedy trial and compulsory joinder grounds. We disagree.

¶ 60    "To prevail on a claim of ineffective assistance of counsel, a defendant must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced defendant such that he was deprived of a fair trial." *People v. Cross*, 2022 IL 127907, ¶ 19. "The failure to establish either prong is fatal." *People v. Keys*, 2023 IL App (4th) 210630, ¶ 59. "[A]n attorney's failure to seek the defendant's discharge on speedy trial grounds will generally be deemed ineffective assistance if there is a reasonable probability that a timely motion would have been granted and no justification for the failure to file it has been proffered." *People v. Resor*, 2024 IL App (4th) 230208, ¶ 32. " 'Counsel's failure to assert a speedy-trial violation cannot establish either prong of an ineffective assistance claim if there is no lawful basis for raising a speedy-trial

---

[1]The State also filed additional possession charges; however, defendant does not challenge the State's addition of those charges on appeal.

objection,' so 'we must first determine whether defendant's right to a speedy trial was violated.' "

*Id.* ¶ 33 (quoting *People v. Phipps*, 238 Ill. 2d 54, 65 (2010)).

¶ 61     Pursuant to section 103-5(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-5(a) (West 2022)), a continuously detained defendant must be tried within 120 days of being taken into custody, less only delays attributable to the defendant. This 120-day period commences automatically. *People v. McBride*, 2022 IL App (4th) 220301, ¶ 38. In *McBride*, our colleagues in the Fourth District explained:

> " 'Application of the speedy-trial act is a straightforward counting exercise when the defendant is charged with a single offense.' [Citation.] 'Its application, however, becomes more complicated when the defendant is charged with multiple, but factually related, offenses at different times.' [Citation.] In that situation, principles of compulsory joinder enter the equation. [Citation.]" *Id.* ¶ 39.

Section 3-3 of the Criminal Code of 2012 addresses the joinder of charges as follows:

> "(a) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense.
>
> (b) If the several offenses are *known to the proper prosecuting officer at the time of commencing the prosecution* and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution, except as provided in Subsection (c), *if they are based on the same act*.
>
> (c) When 2 or more offenses are charged as required by Subsection (b), the court in the interest of justice may order that one or more of such charges shall be tried separately." (Emphases added.) 720 ILCS 5/3-3 (West 2022).

21

¶ 62   In cases where additional charges filed at a later date are subject to compulsory joinder with the original charges, " 'the time within which trial is to begin on the new and additional charges is subject to the same statutory limitation that is applied to the original charges.' " *People v. Williams*, 204 Ill. 2d 191, 201 (2003) (quoting *People v. Williams*, 94 Ill. App. 3d 241, 248-49 (1981)). We conduct a *de novo* review when determining whether additional charges are subject to compulsory joinder and whether defendant's statutory right to a speedy trial has been violated. *McBride*, 2022 IL App (4th) 220301, ¶ 28; *People v. Van Schoyck*, 232 Ill. 2d 330, 335, 328 (2009) (right to speedy trial); *People v. Woodrum*, 223 Ill. 2d 286, 300 (2006) (compulsory joinder).

¶ 63   Here, the compulsory joinder rule did not apply where the additional charges were based on facts not known to the prosecution at the time the original charges were filed. As the State correctly notes, " 'knowledge' or 'known to the proper prosecuting officer' means the conscious awareness of evidence that is sufficient to give the State a reasonable chance to secure a conviction." *McBride*, 2022 IL App (4th) 220301, ¶ 41 (quoting *People v. Luciano*, 2013 IL App (2d) 110792, ¶ 78). As defendant correctly notes, "[t]he only difference between the new conspiracy charges and the initial delivery charges was the added allegation that [defendant] agreed with [Inman] to commit the alleged deliveries." We agree with the State that the fact that defendant and Inman were in the same vehicle when law enforcement discovered the methamphetamine and cannabis was insufficient to support a conspiracy charge. Specifically, it was insufficient to demonstrate that there was an agreement between defendant and Inman to deliver the methamphetamine and cannabis.

¶ 64   An agreement can be established by words, acts, or understanding. *People v. Adams*, 238 Ill. App. 3d 733, 739 (1992). The State sought to prove this agreement through cell phone data that was not available to the State at the time the original charges were filed on May 12, 2023.

22

Specifically, the State submitted the Facebook messages and phone calls between the Luc Gater and SAm Imman Facebook accounts to prove an agreement between defendant and Inman. These messages indicated that defendant asked Inman "how the money looks down there" and Inman responded, "Great." Defendant then sent a message to Inman that stated, "Boe, they say ya[']ll hot right now, boe," and Inman responded, "Lol that's y ya can take over." The cell phone data also demonstrated that multiple Facebook calls were exchanged between defendant and Inman.

¶ 65    It appears that Wallace received defendant's cell phone on May 17, 2023, and completed an analysis the following day. Wallace returned the cell phone to Officer Mullins on May 24, 2023. The State furnished copies of the messages to defense counsel on June 28, 2023. The State filed the amended information adding the conspiracy charges on September 5, 2023. Thus, the State lacked knowledge of the facts supporting the conspiracy charges when the original charges were filed, and the compulsory joinder rule did not apply. Because the compulsory joinder rule did not apply, there was no speedy trial violation. Accordingly, defense counsel was not ineffective for failing to raise a meritless claim.

¶ 66                              C. Witness Exclusion

¶ 67    Defendant argues that he was denied a fair trial where Officer Earnst was permitted to remain in the courtroom and sit at the prosecution's table throughout the trial. We disagree.

¶ 68    As an initial matter, we agree with the State that any alleged error was invited. " '[W]here, as here, a party acquiesces in proceeding in a given manner, he is not in a position to claim he was prejudiced thereby.' " *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001) (quoting *People v. Schmitt*, 131 Ill. 2d 128, 137 (1989)). "Active participation in the direction of proceedings, as in this case, goes beyond mere waiver." *Id.* "[I]t is well established that 'an accused may not ask the trial court to proceed in a certain manner and then contend in a court of review that the order which he

23

obtained was in error.' " *People v. Segoviano*, 189 Ill. 2d 228, 241 (2000) (quoting *People v. Lowe*, 153 Ill. 2d 195, 199 (1992)). Here, defense counsel moved to exclude witnesses from the courtroom pursuant to a discussion with the State and trial court off the record. When the trial court responded, "Except for Officer Earnst," defense counsel stated, "Other than Officer Earnst pursuant to local practice, yes." This exchange evidences defense counsel's affirmative acquiescence to a local practice of allowing Officer Earnst to remain in the courtroom throughout the trial. Thus, we agree with the State that defense counsel invited any alleged error and that defendant forfeited plain-error review. *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17 ("However, plain-error review is forfeited when the defendant invites the error.").

¶ 69 Despite this, defendant maintains that defense counsel was ineffective for failing to object to the presence of Officer Earnst throughout the trial. "Claims of ineffective assistance of counsel are not precluded by the invited error doctrine." *People v. Drew*, 2024 IL App (5th) 240697, ¶ 31. Thus, we consider defendant's alternative claim.

¶ 70 As noted, "[t]o prevail on a claim of ineffective assistance of counsel, a defendant must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced defendant such that he was deprived of a fair trial." *Cross*, 2022 IL 127907, ¶ 19. "The failure to establish either prong is fatal." *Keys*, 2023 IL App (4th) 210630, ¶ 59. In other words, "failure to establish prejudice is a sufficient basis to deny a claim of ineffective assistance of counsel." *Drew*, 2024 IL App (5th) 240697, ¶ 34. "[I]f it is easier to dispose of an ineffective-assistance claim on the ground that it lacks a showing of sufficient prejudice, a court may proceed directly to [the] prejudice prong and need not determine whether counsel's performance was deficient." *People v. Johnson*, 2021 IL 126291, ¶ 53 (citing *People v. Givens*, 237 Ill. 2d 311, 331 (2010)).

24

¶ 71     Here, defendant is unable to demonstrate that he was prejudiced by defense counsel's failure to object to the presence of Officer Earnst throughout the trial. Illinois Rule of Evidence 615 (eff. Jan. 1, 2011) provides as follows:

> "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by law to be present."

"While some jurisdictions, including the federal courts, consider the exclusion of witnesses to be a matter of right, in Illinois exclusion of witnesses is a matter within the sound judicial discretion of the trial court." *People v. Chatman*, 2022 IL App (4th) 210716, ¶ 67. "It is well settled under Illinois law that a testifying police officer may be present at trial during other witnesses' testimony and sit at the prosecutor's table with counsel." *Id.* ¶ 69 (citing *People v. Leemon*, 66 Ill. 2d 170, 174 (1977); *People v. Miller*, 26 Ill. 2d 305, 307 (1962); *People v. Chennault*, 24 Ill. 2d 185, 188 (1962); *People v. Dixon*, 23 Ill. 2d 136, 138 (1961); *People v. Strader*, 23 Ill. 2d 13, 23 (1961); *People v. Townsend*, 11 Ill. 2d 30, 47 (1957)). A trial court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *People v. McDonald*, 2016 IL 118882, ¶ 32. "To the extent that the proper interpretation of Rule 615 is at issue, our review is *de novo*." *People v. Taylor*, 2024 IL App (5th) 220116-U, ¶ 60 (citing *People v. Campbell*, 224 Ill. 2d 80, 84 (2006)).

¶ 72     In *Taylor*, this court concluded that the trial court could permit a lead detective to remain in the courtroom during trial as a designated representative of the State—the second exception set

forth in Illinois Rule 615. 2024 IL App (5th) 220116-U, ¶ 61. This court additionally concluded that the defendant "failed to establish that he was prejudiced by the detective's presence in the courtroom." *Id.* ¶ 62. In so concluding, this court further noted as follows:

> "It is not inherently prejudicial for an investigative agent to be seated with the prosecutor during trial. Thus, [the detective's] mere presence, without more, is not enough to show that his credibility or the State's case was unfairly bolstered. Also, after reviewing the testimony, we conclude that there is nothing in the record to support the defendant's argument that [the detective's] presence in the court room during the trial intimidated witnesses." *Id.*

¶ 73　　Similarly, here, Officer Earnst's presence at trial fell within the second exception set forth in Rule 615. While defendant maintains that Officer Earnst remained at the prosecutor's table throughout the trial, we agree with the State that there is nothing in the record that definitively establishes that Officer Earnst remained at the prosecutor's table throughout the entire trial. Moreover, even if Officer Earnst was present throughout the trial, we conclude that defendant failed to establish that he was prejudiced by Officer Earnst's presence in the courtroom or his presence at the prosecutor's table. We reject defendant's argument that the State's introduction of Officer Earnst during *voir dire* demonstrated that Officer Earnst's credibility or the State's case was unfairly bolstered. After carefully reviewing the record, we also conclude, as we did in *Taylor*, that there is nothing that supports defendant's argument that Officer Earnst's presence in the courtroom during the trial intimidated witnesses. Defendant's assertion that Officer Earnst's presence at the prosecutor's table "had the potential to influence and intimidate the other testifying witnesses" is speculative and insufficient to demonstrate prejudice.

¶ 74    We also reject defendant's claim that Officer Earnst's presence throughout the trial provided Officer Earnst the opportunity to change his testimony and comment on other witnesses' testimony. We fail to see the significance of Officer Earnst's testimony regarding whether defendant called the owner of the vehicle during the traffic stop, where the evidence presented at trial demonstrated that defendant was not the registered owner of the vehicle. While Officer Earnst testified that defendant's testimony that Officer Earnst took his cell phone before placing him in the patrol vehicle was "[u]ntrue," Officer Earnst was permitted to contradict defendant's testimony while testifying as a rebuttal witness. Officer Earnst merely clarified when he took defendant's cell phone.

¶ 75    Thus, we conclude that defendant failed to establish that he was prejudiced by Officer Earnst's presence at trial. Because there was no error in allowing Officer Earnst to remain in the courtroom or sit at the prosecutor's table during trial, defense counsel was not ineffective for failing to raise the issue.

¶ 76                                    D. Sentence

¶ 77    Defendant argues that this court should remand for resentencing where the trial court imposed an excessive 20-year sentence that was based on aggravating factors inherent in the offense. Specifically, he argues that the court erred by considering that his conduct threatened serious harm and that he was likely to receive compensation for committing the offense. We disagree.

¶ 78    As an initial matter, we note that defendant forfeited review of this issue by failing to object at sentencing and raise the issue in a postsentencing motion. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("It is well settled that, to preserve a claim of sentencing error, both a contemporaneous

27

objection and a written postsentencing motion raising the issue are required."). Accordingly, defendant failed to preserve this issue for review.

¶ 79 Nevertheless, defendant argues that this court should review his claim under the plain-error doctrine. "The plain error rule is a well-established exception to forfeiture principles, allowing reviewing courts discretion to excuse a defendant's procedural default." *People v. Moon*, 2022 IL 125959, ¶ 19. However, the plain error rule is not a "general savings clause" (*People v. Precup*, 73 Ill. 2d 7, 16 (1978)), but instead it provides "a narrow exception to forfeiture principles designed to protect the defendant's rights and the reputation of the judicial process." *Moon*, 2022 IL 125959, ¶ 21. To obtain relief under the plain-error doctrine, a defendant must first show that a clear or obvious error occurred. *Hillier*, 237 Ill. 2d at 545. "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.* The defendant bears the burden of persuasion under both prongs of the plain-error doctrine. *Id.*

¶ 80 We reject defendant's assertion that the alleged error can be reviewed under the second prong of the plain-error doctrine. " '[S]econd-prong plain error can be invoked only for structural errors ***.' " *People v. Johnson*, 2024 IL 130191, ¶ 91 (quoting *People v. Jackson*, 2022 IL 127256, ¶ 49). "[S]tructural errors affect the very framework within which the sentencing hearing proceeds, rather than mere errors in the sentencing process itself." *Id.* ¶ 89. "Because a sentencing court is required to weigh all the evidence and factors in aggravation and mitigation to determine a defendant's culpability in imposing the sentence (see 730 ILCS 5/5-4-1 (West 2018)), a structural error at sentencing is an error that renders the sentencing hearing itself an unreliable means of implementing that balance." *Id.*

¶ 81　In the present case, the trial court's alleged error of considering factors inherent in the offense does not satisfy the standard of structural error because the alleged error did not affect the procedural framework of the sentencing hearing. The alleged error was, at most, an error in the sentencing process itself. *Id.*; see *Moon*, 2022 IL 125959, ¶ 29. "Nor did the error undermine the integrity of the judicial process or render the sentencing hearing fundamentally unfair." *Johnson*, 2024 IL 130191, ¶ 90. Accordingly, we decline to consider defendant's argument that the alleged error constituted second-prong plain error. We, instead, consider whether defendant has met his burden of proving a clear or obvious error occurred and that the evidence at sentencing was closely balanced.

¶ 82　"Illinois courts have long recognized that the imposition of a sentence is left to the sound discretion of the trial court and will not be altered upon review absent an abuse of that discretion." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15. "An abuse of discretion will be found only where the sentencing court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Id.* ¶ 26. A reviewing court affords deference to the trial court's sentencing decision because the trial court "is generally in a better position than the reviewing court to determine the appropriate sentence, as it has the opportunity to weigh factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id.* Consequently, a reviewing court may not overturn a sentence merely because it might have weighed the pertinent factors differently. *Id.*

¶ 83　"Illinois courts recognize that sentences are presumed to be proper." *Id.* ¶ 28 (citing *People v. Boclair*, 225 Ill. App. 3d 331 (1992)). "When a sentence imposed falls within the statutorily prescribed range, it will not be found to be excessive or an abuse of discretion unless the sentence greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature

of the offense." *Id.* (citing *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 33). "In other words, an abuse of discretion may be found, even if the sentence is within the statutory range, if it is contrary to the purpose and spirit of the law." *Id.* (citing *Weiser*, 2013 IL App (5th) 120055, ¶ 33). "The spirit and purpose of the law are promoted when the trial court's sentence reflects both the seriousness of the offense and gives sufficient consideration to the defendant's rehabilitative potential." *Id.* (citing *Boclair*, 225 Ill. App. 3d at 335). "The seriousness of the offense is one of the most important factors for the court to consider." *Id.* (citing *Weiser*, 2013 IL App (5th) 120055, ¶ 32.

¶ 84    "[I]f mitigating evidence is presented at the sentencing hearing, a reviewing court presumes the trial court took that evidence into consideration, absent some contrary evidence." *Id.* ¶ 29 (citing *People v. Shaw*, 351 Ill. App. 3d 1087, 1093 (2004)). "The trial court is not required to recite or assign a value to each factor presented at the sentencing hearing." *Id.* (citing *Shaw*, 351 Ill. App. 3d at 1093). The question of whether the trial court relied on an improper factor at sentencing is a question of law that is reviewed *de novo*. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 65. "The defendant bears the burden to affirmatively establish that the sentence was based on improper considerations, and we will not reverse a sentence imposed by a trial court unless it is clearly evident the sentence was improper." *Etherton*, 2017 IL App (5th) 140427, ¶ 29 (citing *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49).

¶ 85    Here, defendant was convicted of both methamphetamine delivery and methamphetamine conspiracy. Methamphetamine delivery, a Class X felony, has a sentencing range from 12 to 50 years in prison. 720 ILCS 646/55(a)(2)(E) (West 2022). The trial court sentenced defendant to 20 years in prison, which was 8 years above the minimum sentence and 30 years below the maximum sentence. Methamphetamine conspiracy, a Class X felony, has a sentencing range from 6 to 30

years in prison. *Id.* § 65(a); 730 ILCS 5/5-4.5-25(a) (West 2022). Defendant was sentenced to 20 years in prison, which was 14 years above the minimum sentence and 10 years below the maximum sentence for methamphetamine conspiracy. Accordingly, defendant's sentences were well within the statutory range and, thus, we presume his sentences were proper.

¶ 86 The record demonstrates that the trial court considered the mitigating evidence presented at the sentencing hearing. The court specifically stated that it considered defendant's "incarceration would have an impact on his minor child." The court also stated it considered the PSI, which indicated that defendant had mental health conditions. However, there was nothing that indicated defendant suffered from a mental health condition that substantially affected his ability to understand the nature of his acts in committing the drug offenses at issue.

¶ 87 The record demonstrates that the trial court also considered various aggravating factors in imposing defendant's sentences. Specifically, the court noted that defendant had a criminal history (730 ILCS 5/5-5-3.2(a)(3) (West 2022)). While defendant's last conviction was from 2014, the court could properly consider defendant's prior criminal history in imposing a greater sentence. The court also noted that a harsher sentence was necessary to deter others from committing the same crime (*id.* § 5-5-3.2(a)(7)). In our view, the court's consideration of these two aggravating factors supported the court's imposition of a 20-year sentence.

¶ 88 Despite this, defendant maintains that the trial court improperly considered that his conduct threatened serious harm (*id.* § 5-5-3.2(a)(1)) and that he was likely to receive compensation for committing the offense (*id.* § 5-5-3.2(a)(2)). In considering the factors in aggravation, the court stated that defendant's conduct "did threaten serious harm to the community by distributing a very large quantity of methamphetamine in the community. I believe it was slightly more than a pound." We agree with the State that the court only considered the quantity of methamphetamine in

31

connection with defendant's offense threatening serious harm—not as its own aggravating factor. As the State correctly notes, the court additionally found that defendant's conduct did not cause specific serious physical harm to another. Under these circumstances, we agree with the State that no clear or obvious error occurred.

¶ 89 Regarding the trial court's consideration of compensation, we acknowledge that compensation is an implicit factor in most drug transactions and may not be considered as an aggravating factor in most circumstances. *People v. Solis*, 2019 IL App (4th) 170084, ¶ 30. However, the court may consider the nature and circumstances of the offense, including the nature and extent of each element of the crime committed by the defendant. *People v. Robinson*, 391 Ill. App. 3d 822, 842 (2009). The amount of profit a defendant derives from a criminal enterprise, and the actions taken to maximize that amount, reflect on the nature of the crime. *People v. McCain*, 248 Ill. App. 3d 844, 851 (1993). Here, defendant repeatedly claimed, at both trial and sentencing, that he came to Illinois to obtain a job that paid more than he could make in South Carolina. Officer Mullins testified regarding the amount and street value of the methamphetamine defendant had in his possession. We agree with the State that the court properly considered the likelihood of substantial compensation as part of the nature of the offense. Thus, defendant has failed to establish that a clear or obvious error occurred in the court's consideration of compensation in this case.

¶ 90 Even assuming *arguendo* that the trial court erred by considering compensation, we would not find that the court's error amounted to plain error in the present case. In our view, the mitigating and aggravating evidence presented at defendant's sentencing hearing was not closely balanced and, thus, defendant has failed to show plain error for this additional reason.

¶ 91 Defendant alternatively argues that defense counsel was ineffective for failing to raise the alleged error at sentencing or in a motion to reconsider sentence. "When addressing a claim of

32

plain error and an alternative claim of ineffective assistance of counsel, appellate courts first consider whether the defendant has established a clear or obvious error. 'Absent a clear or obvious error ***, neither the doctrine of plain error nor a theory of ineffective assistance affords any relief from the forfeiture.' " *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 78 (quoting *People v. Jones*, 2020 IL App (4th) 190909, ¶ 179). Because we determined that there was no clear or obvious error in the trial court's consideration of the aggravating factors and imposition of a 20-year sentence, defendant's claim of ineffective assistance of counsel similarly fails, as there was no error to object to or to include in a motion.

¶ 92    In sum, we conclude that the trial court did not improperly consider factors inherent in the offense and it did not abuse its discretion by sentencing defendant to 20 years in prison for methamphetamine delivery.

¶ 93                              E. Conspiracy Conviction

¶ 94    Lastly, defendant argues that this court should vacate his methamphetamine conspiracy conviction, where he was also convicted of the principal offense of methamphetamine delivery. We agree.

¶ 95    As an initial matter, defendant forfeited review of this issue by failing to object at the sentencing hearing and by failing to include the issue in a motion to reconsider sentence. *Hillier*, 237 Ill. 2d at 544. However, we may review this issue under the plain-error doctrine. *People v. Haycraft*, 349 Ill. App. 3d 416, 429-30 (2004).

¶ 96    "No person shall be convicted of both the inchoate [offense] and the principal offense." 720 ILCS 5/8-5 (West 2022). "Conspiracy is an inchoate offense." *People v. Turner*, 2022 IL App (5th) 190329, ¶ 74. "[A] judgment of conviction and sentence may be entered on either the inchoate or the principal offense, but not both." *People v. Gomez*, 286 Ill. App. 3d 232, 235 (1997).

"Where a defendant has been convicted of both the principal and inchoate offenses, the proper procedure is to vacate the conviction and sentences with respect to the inchoate offenses." *People v. Johnson*, 250 Ill. App. 3d 887, 905 (1993).

¶ 97 Here, defendant was convicted and sentenced for the principal offense of methamphetamine delivery and the inchoate offense of methamphetamine conspiracy, both of which stemmed from the methamphetamine recovered from the vehicle during the May 9, 2023, traffic stop. Accordingly, we vacate defendant's conviction and sentence for methamphetamine conspiracy. We note that defendant's concurrent 20-year sentence for methamphetamine delivery stands and, thus, his ultimate sentence remains unchanged.

¶ 98 Defendant requests that this court remand for resentencing. "Where a defendant is convicted of multiple offenses, reversal of one conviction does not *per se* require that the defendant be resentenced on the remaining conviction or convictions, as long as the record shows that the trial court considered the offenses separately and sentenced the defendant separately on each offense. [Citation.]" *People v. Sonntag*, 238 Ill. App. 3d 854, 857 (1992).

¶ 99 Here, as detailed above, the trial court set forth its reasoning for imposing the 20-year sentence for methamphetamine delivery. While the court sentenced defendant to 20 years for both methamphetamine conspiracy and methamphetamine delivery, the record reveals that the court considered the offenses separately and sentenced defendant separately on each offense. Based on our review of the record, we conclude that the sentences imposed by the court were not so interrelated that a new sentencing hearing is required. See *Haycraft*, 349 Ill. App. 3d at 430.

¶ 100 In sum, we affirm defendant's conviction and sentence for methamphetamine delivery (the principal offense) but vacate defendant's conviction and sentence for methamphetamine conspiracy (the inchoate offense).

¶ 101                          III. CONCLUSION

¶ 102  For the reasons stated, we vacate defendant's conviction and sentence for methamphetamine conspiracy and affirm the remaining judgment of the circuit court.

¶ 103  Affirmed in part and vacated in part.